The State, *ex rel.,* v. Howat.

No. 23,505.

THE STATE OF KANSAS, ex rel. RICHARD J. HOPKINS, as Attorney-general, et al., *Appellee,* V. ALEXANDER HOWAT et al., *Appellants.*

### SYLLABUS BY THE COURT.

CONSTITUTIONAL LAW—*Act Creating Court of Industrial Relations— Labor Strike Threatened by Defendants—Injunction Properly Granted —Injunction Violated by Defendants—Act Constitutional—Defendants Properly Punished for Contempt.* The defendants, as officers and members of the district board of District No. 14, United Mine Workers of America, were about to call a strike of miners and mine workers in that district, which comprises the coal-producing counties of Kansas. The strike, if called, would prevent the carrying on of·business, commerce, occupations, and work in the state, would stop production, manufacture and transportation of necessaries of life, would inhibit domestic and household activities of the people, would affect the public peace and the public health, would cut off the supply of fuel for the state's educational, penal, charitable, and other institutions, and would otherwise inflict on the public irreparable injury, for which there was no redress. One object of the strike was to defeat the purposes of chapter 29 of the Laws of 1920, creating a tribunal known as the court of industrial relations, to regulate certain industries, including that of coal mining. In an action brought by the state, the defendants were enjoined from calling a strike. Afterwards they violated the injunction, were proceeded against for contempt of court for violating the injunction, and were found guilty, after a trial before the court, without a jury. The conduct of the defendants in calling the strike was punishable as a felony under the statute referred to. *Held:*

1. The state was authorized to apply for, and the court was authorized to grant, the injunction, to avert threatened public calamities, irrespective of the state's ownership of property affected, and without the aid of a statute.

2. The injunction order was not forbidden by section 7149 of the General Statutes of 1915, relating to granting injunctions in specified cases of industrial disputes.

3. The injunction order was not invalid as an attempt to enjoin the commission of crime.

4. The defendants were not entitled, in the contempt proceeding, to a trial by jury.

5. The contempt proceeding was otherwise free from irregularity.

6. The act creating the court of industrial relations is not void under the constitution of this state because of duality of subject, or defect of title, or because it commingles functions of separate departments of government, or because it attempts to enlarge the original jurisdiction of this court.

The State, *ex rel., v.* Howat.

7. The business of producing coal in this state bears an intimate relation to the public peace, health, and welfare, is affected with a public interest, and may be regulated, to the end that reasonable continuity and efficiency of production may be maintained.

8. The act creating the court of industrial relations is a reasonable and valid exercise of the police power of the state over the business of producing coal, and does not impair liberty of contract or permit involuntary servitude, contrary to the constitution of the United States.

Appeal from Crawford district court, division No. 1; AN-DREW J. CURRAN, judge. Opinion filed June 11, 1921. Affirmed.

*Phil H. Callery,* of Pittsburg, *Redmond S. Brennan,* and *Thurman L. McCormick,* both of Kansas City, Mo., for the appellants.

*Richard J. Hopkins,* attorney-general, *John G. Egan, J. K. Rankin, E. W. Clausen,* assistant attorneys-general, *Baxter D. McClain,* attorney, court of industrial relations, *C. A. Burnett,* county attorney, *F. S. Jackson,* of Topeka, and *F. Dumont Smith,* of Hutchinson, for the appellee.

*D. R. Hite,* and *John S. Dean,* both of Topeka, as *amici curiæ.*

The opinion of the court was delivered by

BURCH, J.: Alexander Howat and others were adjudged guilty of contempt of the district court, and appeal.

At a special meeting of the legislature held in January, 1920, an act was passed declaring that the manufacture or preparation of food products, the manufacture of clothing, the mining or production of fuel, and the transportation of food, clothing, and fuel, are industries affected with a public interest; that reasonable continuity and efficiency in the operation of such industries affect the living conditions of the people; and that consequently such industries are subject to state supervision, for the purpose of preserving the public peace, protecting the public health, preventing industrial strife, disorder, and waste, and promoting the general welfare. A supervising body was created, called the court of industrial relations. Persons, firms, corporations and associations were forbidden willfully to hinder, delay, limit or sus-

pend continuous and efficient operation of the supervised industries, contrary to the act or for the purpose of evading any of its provisions. The right of any individual worker to quit his employment at any time was expressly recognized; but conspiracy and confederation with others, and inducement and intimidation of others, with intent to cause suspension of operation of supervised industries, or to limit their output, was declared unlawful. The court of industrial relations was given authority to investigate, adjust, settle and determine controversies between employers and workers, or between groups or crafts of workers, which might endanger continuity or efficiency of service of supervised industries, affect production or transportation of the necessaries of life referred to, produce industrial strife, disorder, or waste, or threaten the public health, peace, or welfare. Willful violation of provisions of the act was made punishable as a misdemeanor. Officers of corporations and officers of labor unions and associations who willfully use their power and authority to influence, impel or compel any other person to violate the act, were declared guilty of felony, and punishable accordingly. The full text of the statute, chapter 29 of the Laws of 1920, is appended to this opinion.

The United Mine Workers of America is a voluntary association of miners and workers in mines, organized as a labor union, for the purpose of furthering the interests of members in the United States. District No. 14 of the United Mine Workers of America includes the counties of Crawford, Cherokee, and Osage, in which the bulk of the coal mined in Kansas is produced. In April, 1920, the officers of District No. 14 were: President, Alexander Howat; vice president, August Dorchy; secretary-treasurer, Thomas Harvey; all of Pittsburg, Kan. Members of the board of directors or trustees were James McIlwrath, John Fleming, William Jenkins, Amos Standering, and John Billings. Willard Titus had been elected as successor to William Jenkins. Thomas Cunningham was a traveling auditor and agent. On April 5, 1920, the attorney-general commenced an action on behalf of the state against the associations and persons named and other persons who were stated to be officers and members of local unions of District No. 14, to enjoin them from interfering with the operation of coal mines

in the counties named and causing the production of coal to be delayed, hindered, and stopped.

The petition alleged that the defendants were conspiring and confederating among themselves and with others to violate the act creating the court of industrial relations. The defendant, Howat, had publicly announced that he proposed to fight the statute with a force of 12,000 miners in Kansas, regardless of consequences, and the miners had pledged him their support, to the end that the force and effect of the statute might be nullified. The conspiracy was to be executed by calling a general strike of mine workers in the mines in Kansas, thereby causing the production of coal to be stopped. Howat had announced that he was about to call such a strike, and would do so early in April. The result would be to prevent the carrying on of business, commerce, industries, occupations and work in the state, to hinder, lessen, and stop the production, manufacture and transportation of the necessaries of life, and to inhibit even domestic and household activities of the people of the state. The state of Kansas owns and uses buildings and other property, conducts a variety of institutions, educational, penal, and charitable, and operates certain industries, in the exercise of its governmental functions. To accomplish its ends, it purchases and uses more than 100,000 tons of coal yearly, and one of the results of the conspiracy would be to cut off this supply of fuel. Pursuant to the conspiracy, members of labor unions had already simultaneously quit work and caused mines to be shut down, assigning as a reason, opposition to the law creating the court of industrial relations, coupled with some cause of minor significance. The court of industrial relations had taken jurisdiction of a controversy between employers and miners, and in the exercise of such jurisdiction had subpœnaed Howat and others to testify as witnesses. They had refused to obey the subpœnas, and subpœnas for like purposes issued by the district court, and had been committed to jail for contempt of court, there to remain until they should submit to the law and give their testimony. The constitution and by-laws of District No. 14 had been amended to impose a fine of $50 for each offense on any member, committee or local officer who would be privy to referring a controversy to the court of industrial relations,

and imposing a fine of $5,000 on any district officer of District No. 14 who would be a party to the reference of any grievance to the court of industrial relations. These amendments enabled Howat and his associates to impose their will upon mine workers. Without continuous and effective operation of the coal mines, all the loss, suffering, and irreparable injury of the coal strike of December, 1919, fresh in the minds of the people and of the defendants, would be repeated; and the state was without adequate remedy at law. The prayer was for a temporary injunction and, upon final hearing, for a permanent injunction, enjoining the defendants from further conspiring with each other, and from carrying out any conspiracy to interfere with the operation of coal mines in the counties named, to limit production, to cause the workers to leave employment, to influence them to quit their employment, and to cause the production of coal to be delayed, hindered, and stopped.

A temporary injunction was issued, the petition was amended and supplemented, answers were filed, and upon final hearing the court found all the facts contained in the plaintiff's pleadings to be true, found all the issues joined in favor of the plaintiff and against the defendants, and entered a decree in favor of the state, making the temporary injunction permanent.

In February, 1921, the officers of the district board of District No. 14 called a strike in two mines of the George K. Mackie Fuel Company, one in Crawford county, and one in Cherokee county. The order was transmitted to local unions Nos. 498 and 310, and by their officers communicated to the members, who, obedient to the order, went on strike. An affidavit stating the facts, and charging those concerned in calling the strike with contempt, was presented to the district court on February 7. After a hearing, the court found there was reasonable ground for believing the defendants named in the affidavit had violated the commands of the injunction, and ordered their arrest. They were arrested and brought into court, and were given an opportunity to purge themselves. Harvey, Cunningham, Billings and Standering were dismissed, on the ground their statements showed they were not guilty of the charge. The court directed the state to file forthwith

accusation against the defendants, Howat, Dorchy, McIlwrath, Fleming, Titus, and Maxwell, and fixed a time for answer. The defendants answered, and, after a hearing before the court, without a jury, the court found the facts stated in the accusation to be true as to the defendants last named, found them to be guilty of violation of the injunction and of contempt of court, and ordered that they be confined in the jail of Crawford county for the period of one year, and pay the costs of the prosecution.

The assignments of error present questions relating to regularity of the contempt proceeding, relating to validity of the violated injunction, relating to validity of the act creating the court of industrial relations under the constitution of the state of Kansas, and relating to validity of the act under the constitution of the United States.

It is said the court erred in arraigning the defendants in the absence of counsel, in compelling them to testify against themselves, and afterwards in using the extorted testimony in the trial on the accusation for contempt. There was no "arraignment" of the defendants, in the sense in which that term is used in criminal procedure. The usual course in contempt proceedings was observed. When arrested the defendants were brought into court, and were asked if they desired to make any statements. Howat and Dorchy made voluntary statements, and then freely gave voluntary answers to a few questions propounded to them. They were accompanied by an attorney, who participated in the proceedings, made no objection to what occurred, and secured a postponement until chief counsel for defendants could arrive. Howat having answered that "we called a strike," meaning by "we" a majority of the district board of District No. 14, and Dorchy having said he was guilty, the court directed a formal accusation to be prepared, to which the defendants afterwards pleaded, and on which, in due time, they were tried. At the trial the voluntary statements and answers to questions were read in evidence. At the trial Alexander Howat was called as a witness by the defendants and, on examination by their counsel, gave a detailed account of the calling of the strike which constituted contempt of the injunction order. Some objections to the proceedings relating to evidence are not

deemed to be of sufficient importance to require special consideration.

It is contended the district court erred in refusing to grant the defendants a jury trial. In support of the contention it is said the defendants were charged with a felony, and were convicted of that which under the law constitutes a felony. These assertions are the foundation for an extended argument that the defendants were denied justice in the district court. The entire argument stands or falls with the truth or untruth of the assertions. Neither one has any basis of fact, or any warrant in logic or in the law.

The defendants were charged with contempt of court, for disobedience of an injunction, and contempt of court for disobedience of an injunction is not punishable as a felony, or as crime of any other degree, by any statute of this state. The purpose of the proceeding was not to enforce any criminal statute of the state, but was to vindicate the authority and integrity of the court as an organ of public justice. It was not of the slightest consequence that the acts committed in violation of the injunction, and constituting contempt, also constituted infractions of the criminal law, and infractions of the criminal law of the grade of felony. In the case of *United States v. Shipp*, 203 U. S. 563, 214 U. S. 386, and 215 U. S. 580, members of the mob which hanged the negro Johnson committed contempt by committing murder. The distinction between proceedings to punish contempt committed by crime, and proceedings to punish crime as such, is as old as the law of contempt, and the distinction has been observed and acted on by courts, state and Federal, including the supreme court of the United States. This court, in a series of decisions, has interpreted the provisions of the constitution of the state cited by counsel for the defendants in a manner too plain to be misunderstood. It is not necessary to collate authorities. Counsel for the defendants cite no cases from the literature of the law except Kansas cases, and those Kansas cases which apply directly to the subject under discussion are not referred to.

It is to be regretted that the defendants, and particularly the coal miners of southeastern Kansas, many of whom are foreigners and not familiar with our legal institutions, have not had this subject made clear to them by those in a position to

do so. It would not be possible to make the matter plain, to their untrained minds, within the limits of a judicial opinion. Briefly, it may be said that power of a court to punish for contempt is, in the last analysis, on similar footing with a miner's privilege to work—it touches the right to exist. Whatever executive officers, concerned with enforcement of the criminal statutes, may do about bringing and prosecuting criminal actions, and whatever success they may have in that field, the court must possess authority to punish contempt, or it cannot discharge its functions as a court. This was the law when all the modern charters of human liberty were framed. A court established by the constitution, such as the district court of Crawford county, may not be deprived of this power, except by the constitution itself, and the Kansas constitution does not do so. If the power be unwisely reposed, the remedy is by constitutional amendment. Until a change is made to call a contempt proceeding a criminal prosecution, in the sense that a jury trial is necessary, is to darken counsel by misuse of well-understood terms. The foregoing sufficiently disposes of a contention that the defendants were denied due process of law because they were tried by the court and not by a jury, but the following quotation from the opinion of the supreme court of the United States, in the case of *Eilenbecker v. Plymouth County*, 134 U. S. 31, is pertinent:

"Whether an attachment for a contempt of court, and the judgment of the court punishing the party for such contempt, is in itself essentially a criminal proceeding or not, we do not find it necessary to decide. We simply hold that, whatever its nature may be, it is an offense against the court and against the administration of justice, for which courts have always had the right to punish the party by summary proceeding and without trial by jury; and that in that sense it is due process of law within the meaning of the fourteenth amendment of the constitution." (p. 39.)

In an assignment of error that the district court erred in overruling the motion to quash the accusation, a collateral attack is made on the injunction order, contempt of which was the basis of the accusation. It is said the injunction was issued in contravention of section 7149 of the General Statutes of 1915, the general nature of which is indicated by the initial provision:

"That no restraining order or injunction shall be granted by any court of the state of Kansas, or a judge or the judges thereof, in any case between an employer and employee, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving or growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property or to a property right of the party making the application, for which injury there is no adequate remedy at law, . . ."

Let it be granted for the moment that the legislature intended this statute to be applicable to the case presented by the petition for injunction. It was within the province of the district court to interpret the statute, and determine whether or not it did apply. The court had jurisdiction to adjudicate upon the subject. If it reached a wrong conclusion, it did not forfeit jurisdiction. The injunction order was simply erroneous, the error was subject to correction by the ordinary method of appeal, and disobedience to the order constituted contempt. (*The State, ex rel., v. Pierce*, 51 Kan. 241, 32 Pac. 924.) Conceding again that the legislature intended the statute to be applicable to the case presented by the petition for injunction, there was ample necessity for issuing the injunction, to prevent irreparable injury to property and property rights of the party making the application, the state of Kansas. The statute, however, had no application to the case made by the petition for injunction. The petition presented no dispute between employer and employee, or between employers and employees, or between employees, or between persons employed and persons seeking employment, and presented no case of dispute concerning terms or conditions of employment. Whether or not the statute conflicts in any particular with the act creating the court of industrial relations, need not be discussed, because the statute has no bearing on this controversy.

Portions of the statute not quoted deal with the subjects of picketing and boycotting, and it is said the legislature, having in mind the great injustice which might be perpetrated by destroying united action, placed a definite prohibition on the issuing of injunctions in labor disputes. The portion of the defendants' brief stating this conclusion is preceded by the following remarkable paragraph:

"In this connection it must be remembered that the power of a court to grant an injunction for any purpose is statutory, and in the absence

of statutory authority no power exists in a court to grant an injunction for any purpose whatever. Again, the power to grant an injunction being statutory and in derogation of the common law, the statute granting said power must be strictly construed. Since this rule is so universally followed and upheld, a citation of authorities in support of the same would be out of place."

The power of a court in any case to grant an injunction for any purpose is not statutory. In the absence of statute, power exists in courts to grant injunctions for numerous purposes. The power not being statutory, and not being in derogation of the common law, is not strictly construed. If the power were statutory, it would be liberally construed, to accomplish just and equitable purposes, because of an express statute of this state which reads as follows:

"The rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of this state, but all such statutes shall be liberally construed to promote their object." (Gen. Stat. 1915, § 11829.)

The rule stated in the quoted paragraph is not universally followed, is not followed at all, and there are no authorities to be cited as sustaining it. This being true, the paragraph must have been intended for some document other than a brief in this court.

It is said the injunction was invalid, as an attempt to enjoin a crime. If so, the injunction order was not void, and the defendants are precluded from attacking it in this proceeding.

In order that the defendants may not feel a rule of procedure has prevented full consideration of their case, it may be said their argument is cast in the same fallacious form as the argument relating to trial by jury. The purpose of the injunction was not to enjoin crime, and bore no other relation to administration of the criminal law. The purpose was to prevent the irreparable injury which the petition for injunction alleged would occur, and which the court found would occur, unless the defendants were restrained·from executing their designs. It might be the defendants would incur sentences to the penitentiary or to jail, but the imposition of those penalties would not fulfill the obligation of the state of Kansas to protect its people from the calamitous consequences of the defendants' wrongdoing, and for which there was no redress. The court

found that all the perils to the public welfare which accompanied the coal strike of the winter of 1919-'20 would again be incurred. That strike caused industry to stop, caused commerce to be demoralized, caused food supplies to be reduced and cut off, caused schools to close, caused suffering in homes, and if the defendants had been permitted to have their way, would have caused the sick to languish and die in unwarmed hospital beds in the dead of winter. If those consequences were produced in a single village by blocking the highway over which necessaries of life were brought in, anybody would say, blocking the highway was a public nuisance, and a court of equity could open the road. Multiplicity and magnitude of threatened disaster do not detract from authority of a court of equity over the few determined individuals who propose to wreak the disaster. Ability of the defendants to paralyze the normal activities of a whole commonwealth did not free them from amenability to injunction. The district court was warranted in interfering on principles identical with those applied in abatement of public nuisances, and the court was not shorn of power because the defendants, if they persisted, would incidentally be guilty of crime.

The general finding on which the injunction was allowed included a finding that the state would be prejudiced in the use of property which it held in the capacity of owner. Conviction and incarceration of the defendants would not get coal for the various institutions, educational, charitable, and correctional, which the state maintains in its own buildings, upon its own land. The authorities are in substantial accord that this special interest authorized the state to apply for, and authorized the district court to grant, the injunction; but this court holds that, aside from this indisputable ground, and without aid of the statute expressly authorizing actions of injunction in the name of the state to suppress public nuisances (Gen. Stat. 1915, § 7163, as amended by Laws of 1917, ch. 247, § 1), the district court was possessed of power to grant the injunction.

In support of their contention the defendants cite some cases. The one principally relied on is the case of *State v. Vaughan*, 81 Ark. 117, and a portion of the opinion is quoted, as follows:

"It is demonstrably true that it is a sound principle of equity jurisprudence that an injunction will not lie at the instance of the state to

restrain a public nuisance where the nuisance is one arising·from the illegal, immoral or pernicious acts of men which for the time being make the property devoted to such use a nuisance, where such nuisance is indictable and punishable under the criminal law." (p. 126.)

The defendants did not quote the next succeeding sentences of the opinion, which sustain the action of the district court of Crawford county:

"On the other hand, if the·public nuisance is one touching civil property rights or privileges of the public, or the public health is affected by a physical nuisance, or if any other ground of equity jurisdiction exists calling for an injunction, a chancery court ·will enjoin, notwithstanding the act enjoined may. also be a crime. The criminality of the act will neither give nor oust jurisdiction in chancery." (p. 126.)

The opinion in the Vaughan case quotes from the opinion in the case of *The People v. Condon,* 102 Ill. App. 449; and the defendants make much of the decision in the Condon case because it accuses the supreme court of the United States of resorting to dictum in the case of *Mugler v. Kansas,* 123 U. S. 623, and because it undertakes to narrow the scope of the decision in the case of *In re Debs, Petitioner,* 158 U. S. 564.

The law of Illinois respecting the subject of the opinion in the Condon case is declared by the supreme court of that state in the case of *Stead v. Fortner,* 255 Ill. 468. The following extracts from the opinion are supported by the citation of numerous authorities:

"A court exercising equitable jurisdiction will not restrain, by injunction, the commission of illegal or immoral acts and will not enjoin one engaged in the sale of liquor from making sales which are punishable by the criminal law. But that is not the object of this suit. The law has a double purpose—to punish the person committing an illegal act and to prohibit the use of property for illegal purposes—and these are separate and distinct. . . .

"It is one of the most useful functions of a court of equity that it may give complete and adequate relief against acts which will constitute nuisances. . . .

"Want of jurisdiction to enjoin a nuisance which might breed a pestilence or be .dangerous to the welfare of the public would be a reproach to the law. . . .

"A court of equity has jurisdiction to abate a public nuisance although offenders are. not only amenable to criminal laws but also where no property rights are involved in the litigation. . . .

"As we have noted above, this court has never regarded a criminal prosecution, which can only dispose of an existing nuisance and cannot prevent a renewal of the nuisance, for which a new prosecution must be

brought, as a complete and adequate remedy for a wrong inflicted upon the public. The public authorities have a right to institute the suit where the general public welfare demands it, and damages to the public are not susceptible of computation. The maintenance of the public health, morals, safety and welfare is on a plane above mere pecuniary damage although not susceptible of measurement in money, and to say that a court of equity may not enjoin a public nuisance because property rights are not involved, would be to say that the state is unable to enforce the law or protect its citizens from public wrongs." (pp. 474-477.)

In the case of *Mugler v. Kansas*, 123 U. S. 623, one of the questions was whether the equity power to abate liquor nuisances, conferred by a statute of this state, was consistent with the constitutional guaranty of liberty and property. In the opinion the court said:

"Equally untenable is the proposition that proceedings in equity for the purposes indicated in the thirteenth section of the statute are inconsistent with due process of law. 'In regard to public nuisances,' Mr. Justice Story says, 'the jurisdiction of courts of equity seems to be of a very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable not only to public nuisances, strictly so called, but also to purprestures upon public rights and property. . . . In case of public nuisances, properly so called, an indictment lies to abate them, and to punish the offenders. But an information, also, lies in equity to redress the grievance by way of injunction.' 2 Story's Eq. §§ 921, 922. The ground of this jurisdiction in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual, and permanent remedy, than can be had at law. They cannot only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury. . . ." (p. 672.)

The pertinency of this discussion to the subject of the decision may be left to the judgment of the discriminating reader.

Referring to the case of *In re Debs, Petitioner*, 158 U. S. 564, the opinion in the Condon case says:

"An examination of this whole opinion shows that the court intended to place and did place the right to issue this injunction upon the sole

The State, *ex rel.*, v. Howat.       .

and only ground that the property of the United States had been inter-
fered with."

In the Debs case the court first demonstrated the undoubted
power of the government of the United States to protect its
property in the mails by invoking the equitable remedy of in-
junction. The court then said:

"We do not care to place our decision upon this ground alone. Every
government, entrusted, by the very terms of its being, with powers and
duties to be exercised and discharged for the general welfare, has a
right to apply to its own courts for any proper assistance in the exercise
of the one and the discharge of the other, and it is no sufficient answer
to its appeal to one of those courts that it has no pecuniary interest in
the matter. The obligation which it is under to promote the interest of
all, and to prevent the wrongdoing of one resulting in injury to the gen-
eral welfare, is often of itself sufficient to give it a standing in court."
(p. 584.)

After reviewing authorities, the opinion proceeded as
follows:

"It is obvious from these decisions that while it is not the province of
the government to interfere in any mere matter of private controversy
between individuals, or to use its great powers to enforce the rights of
one against another, yet, whenever the wrongs complained of are such as
affect the public at large, and are in respect of matters which by the
constitution are entrusted to the care of the nation, and concerning which
the nation owes the duty to all the citizens of securing to them their com-
mon rights, then the mere fact that the government has no pecuniary
interest in the controversy is not sufficient to exclude it from the courts,
or prevent it from taking measures therein to fully discharge those con-
stitutional duties.

"The national government, given by the constitution power to regulate
interstate commerce, has by express statute assumed jurisdiction over
such commerce when carried upon railroads. It is charged, therefore,
with the duty of keeping those highways of interstate commerce free
from obstruction, for it has always been recognized as one of the powers
and duties of a government to remove obstructions from the highways
under its control." (p. 586.)

Concerning the subjects of "injunction against crime" and
"trial by jury in contempt proceedings," the court said:

"The acts of the defendants may or may not have been violations of
the criminal law. If they were, that matter is for inquiry in other pro-
ceedings. The complaint made against them in this is of disobedience to
an order of a civil court, made for the protection of property and the
security of rights. If any criminal prosecution be brought against them
for the criminal offenses alleged in the bill of complaint, of derailing and
wrecking engines and trains, assaulting and disabling employees of the

railroad companies, it will be no defense to such prosecution that they disobeyed the orders of injunction served upon them and have been punished for such disobedience.

"Nor is there in this any invasion of the constitutional right of trial by jury. We fully agree with counsel that 'it matters not what form the attempt to deny constitutional right may take. It is vain and ineffectual, and must be so declared by the courts,' and we reaffirm the declaration made for the court by Mr. Justice Bradley in *Boyd v. United States*, 116 U. S. 616, 635, that 'it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis*.' But the power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court." (p. 594.)

The opinions in the Mugler and Debs cases and the opinion in the Stead case have been quoted at some length, not because they need vindication from the criticism of the Illinois appellate court, but to respond to the defendants' brief, reveal its method, and render unnecessary further examination of authorities. The conclusions stated in the Mugler and Debs cases are binding, so far as they relate to questions arising under the constitution of the United States. The opinions in the three cases sufficiently present arguments and authorities supporting the conclusions reached. Those conclusions are in harmony with previous utterances of this court, and are accepted and adhered to as sound.

It is contended the act creating the court of industrial relations contravenes section 16 of article 2 of the constitution of the state, in that it contains more than one subject, and the subjects are not clearly expressed in the title. It is said the method employed to invest the court of industrial relations with the powers and duties of the public utilities commission, which was abolished, was ineffectual, and consequently the public utilities features of the statute lack the force of law. The conclusion has nothing to do with the assignment of error, and relates to a subject which does not concern the defendants. The section of the constitution referred to does provide that no law shall be revived or amended unless the new act contain the entire act revived or the section or sections amended; but it is not material to the defendants whether the authority formerly possessed by the public utilities com-

The State, *ex rel.*, v. Howat.

mission was preserved to the court of industrial relations; and if in some public utilities case it should be held that the act under consideration left the state without a public utilities law, the remainder of the act would not be affected. (Laws 1920, ch. 29, § 28; *The State, ex rel., v. Howat,* 107 Kan. 423, 191 Pac. 585.)

In a certain sense, the act embraces two subjects: regulation of public utilities, and regulation of those industries which have to do with supplying the people with necessaries of life. In the same sense, the second subject is doubly triple. It embraces food, clothing, and fuel, and it embraces production, manufacture, and distribution. According to the same method, the act might be conceived as divided into as many subjects as a carefully prepared index of its contents would disclose. That, however, is not the method by which to determine the scope of a statute. The question in any case is, Are the particulars so diverse that they may not be connoted in a single generic concept? In this instance the general concept is enterprise affected with a public interest, and the grouping is not only natural, but consistent and harmonious.

It is said that use of the word "court" impairs clearness in the expression of the subject of the act in its title, and that inclusion of public utilities is not indicated at all. The first contention was sufficiently met in the case of *The State v. Scott,* 108 Kan. 166, and it was there said the title is at least as comprehensive as though it read, "An act relating to (or concerning) an administrative body for the regulation of industrial relations." The word "industrial" means relating to industry, and industry clearly embraces those departments devoted to public service. When used in the plural, the word "relations" has the meaning of "affairs." Fifty years ago the title of this act would have conveyed little or no information. It is to be read, however, in the light of common knowledge of the science of government, and particularly the regulation of industry by administrative tribunals, in the year 1920; and the court is of the opinion any one whose interests might be affected by the legislation would be directed to details by the title.

An argument that the title is not broad enough to cover substantive provisions of the act is sufficiently disposed of by

the reasoning and the citation of authority contained in the opinion in the case of *The State v. Scott,* supra.

It is said the act creating the court of industrial relations is void because it commingles functions of the three departments of government. The contention was considered in the case of *The State, ex rel., v. Howat,* 107 Kan. 423, 191 Pac. 585, and was found to be unsound. Some additional specifications are made of functions claimed to be separate according to the orthodox theory, but they do no more than raise the question of the legality of all bodies such as the interstate commerce commission, state public utilities commissions, and similar administrative tribunals, "created for carrying into effect the will of the state, as expressed by its legislation." (*Reagan v. Farmers' Loan & Trust Co.,* 154 U. S. 362, syl. ¶ 1.) A contention that the act is void because it undertakes to usurp control of matters within the jurisdiction of the Federal government and regulated by the Lever act and the Clayton act, was likewise disposed of in the Howat case just cited.

It is contended the act creating the court of industrial relations is void because section 12 undertakes to confer on this court original jurisdiction additional to that permitted by section 3 of article 3 of the constitution, which reads as follows:

"The supreme court shall have original jurisdiction in proceedings in quo warranto, mandamus, and habeas corpus; and such appellate jurisdiction as may be provided by law." (Gen. Stat. 1915, § 172.)

The court of industrial relations is, in fact, a public-service commission, the word "court" having been employed merely as a matter of legislative strategy. The production, manufacture and distribution of food, clothing, and fuel, being industries affected with a public interest, are made subject to regulation in the same manner as those industries which have commonly been designated public utilities. Action by the court of industrial relations would necessarily touch the subjects of liberty and property, and in order to safeguard them from infringement and meet all the requirements of due process of law, a judicial review of orders of the administrative body was provided for by section 12. Resort to this court was authorized in terms which afford opportunity for the determination of issues upon the court's independent judgment, both with respect to the law and the facts. (*Ohio Valley Co.*

*v. Ben Avon Borough,* 253 U. S. 287.)   The appellate juris-
diction of this court not being available because the court of
industrial relations is a nonjudicial body, its constitutional
jurisdiction in mandamus was utilized.   This jurisdiction is
precisely the same as that of any court of general jurisdiction
in mandamus, that is to say, is plenary, may be exercised to
control the action of inferior tribunals (*Bishop v. Fischer,* 94
Kan. 105, 145 Pac. 890; *In re Petitt,* 84 Kan. 637, 114 Pac.
1071), and comprehends the power of superintending control
to the full extent of which the writ of mandamus is capable.

Mandamus is indisputably a proper remedy for enforcing
lawful orders of a public-service commission (*The State v.
Railway Co.,* 81 Kan. 430, 105 Pac. 704; L. R. A. 1918 E, 304,
Annotation), and the only matter for debate is its appropriate-
-ness as a method of compelling the court of industrial relations
to do its duty.   The mandamus statute reads as follows:

"The writ of mandamus may be issued by the supreme court or the
district court, or any justice or judge thereof, during term or at chambers,
to any inferior tribunal, corporation, board or person, to compel the per-
formance of any act which the law specially enjoins as a duty resulting
from an office, trust, or station; but though it may require an inferior tri-
bunal to exercise its judgment, or proceed to the discharge of any of its
functions, it cannot control judicial discretion.

"The writ may not be issued in any case where there is a plain and
adequate remedy in the ordinary course of the law. . . ." (Gen. Stat.
1915, §§ 7646, 7647.)

The court of industrial relations is clearly a board, within
the meaning of this statute.   The entering of orders in respect
to matters committed to its jurisdiction is a duty resulting
from office, trust, or station.   The tribunal appointed to make
orders in the field of industrial relations having already func-
tioned, application to it no longer affords remedy in the ordi-
nary course of law for such cases. (*Telephone Association v.
Telephone Co.,* 107 Kan. 169, 190 Pac. 747.)   Constitutional
limitations, state and Federal, and express statutory provi-
sions, furnish standards of conduct.   Sections 8 and 9 of the
court of industrial relations act require orders to be just and
reasonable.   Section 12 itself measures the duty which the
statute enjoins, and all the prerequisites exist for maintaining
an action of mandamus to compel performance of the duty to
enter just, reasonable and lawful orders.

It is contended that if in any case this court should find an order made by the court of industrial relations to be unjust, unreasonable, or unlawful, this court is directed to prescribe definitely what would be a proper order, and then compel the court of industrial relations to enter it. Applying the argument to action by the court of industrial relations on its public utilities side, if this court should find a rate to be confiscatory, it should step over into the field of legislation, fix the correct rate, and then compel the court of industrial relations to put the prescribed rate in force. In order to impose such a meaning upon the phraseology of the statute, the court would be obliged to apply the opposite of the well-known canon of interpretation, and strive to invalidate, instead of strive to uphold, the law. The evident purpose of the legislation was to give equal remedies to and against the court of industrial relations, in order that just, reasonable and lawful regulations, when established, may prevail, and in order that, in case of contest, just, reasonable and lawful regulations shall be established. Being a creature of the legislature, the court of industrial relations may be placed under such superintending control as the legislature chooses. The discretion which the court of industrial relations exercises is not judicial discretion, and consequently is not within the protection of the mandamus statute quoted above. To accomplish the purpose of the act, the tribunal created is in effect limited in its authority to promulgation of orders of the character described in section 12. Exercise of that authority in case of controversy is, however, the prime object of the act—is the very duty which the law specially enjoins; and the duty is not performed until a just, reasonable and lawful order has been entered. The remedy of mandamus is made available, as in any other case covered by the mandamus statute, except that application must be made to this court. The court acts according to the common course of judicial procedure in actions of mandamus. Findings showing the particulars in which the contested order fails may serve as a guide in framing a proper order, but the duty to frame a proper order is legislative, and rests with the court of industrial relations. If a peremptory writ be awarded, the mandate is to perform the duty contemplated by the statute. When the mandate is obeyed, the order entered is the order of the court of industrial relations, and not of this court.

The State, *ex rel.*, v. Howat.

It is said the act creating the court of industrial relations is void because it contravenes the fourteenth amendment to the constitution of the United States, in that it destroys liberty of contract and permits involuntary servitude on the part of workingmen.

The question which presented itself to the mind of the legislature may be indicated.

Employers and employees disagree about how the product of their joint contributions to industry shall be divided. In the last analysis, hours, working conditions, recognition of union, etc., revolve about this fundamental subject of grievance. The subject is of great importance to the employer. It is of even greater importance to the employee, because on wages depend food, clothing, and shelter; recreation, and the details of daily living; the value of the worker to the community in which he lives; and even the length of time he will live. Disagreements become acute, the contestants become hostile to each other, sometimes each one resorts to force, and the public, the great employer of both labor and capital, suffers grievously. In an address before the federation of engineering societies at Washington, D. C., November 20, 1920, Mr. Herbert Hoover, now secretary of commerce and labor, made an appeal for industrial coöperation in which he said:

"In the question of industrial conflict resulting in lockout and strike one mitigating measure has been agreed upon in principle by all sections of the community. That is collective bargaining, by which, wherever possible, the parties should settle their difficulties before they start a fight. . . .

"Battle and destruction are a poor solution to these problems. The growing strength of national organizations on both sides should not and must not be contemplated as an alignment for battle. Battle quickly loses its rules of sportsmanship and adopts the rules of barbarism."

The legislature understood all this; but if the parties should not succeed in settling their difficulties, why should they be permitted to start a fight, which quickly brings upon the public a recrudescence of barbarism?

In dealing with the subject of the constitutionality of the legislation of 1920, the court can render no service by veiling the harshness of reality. The court of industrial relations is justified by facts, or is not justified at all, and it will be necessary to present a few disagreeable facts which lie naked to astonished gaze in our industrial history.

The accusation against Debs in the case which has been referred to contained the following statements of fact:

"That, as a direct result of the orders to strike upon some of the lines —notably upon the Illinois Central Railroad, the Chicago, Rock Island & Pacific, the Chicago, Burlington & Quincy, the Chicago & Alton, the Chicago & Western Indiana, and upon the Pennsylvania Company's lines—there was exercised upon the part of many of the strikers or ex-employees of the railway companies intimidation and open violence. That employees who refused to join in the strike, and others who had been employed by the railway companies to take the place of strikers, and were in the actual service of the companies, were assaulted and intimidated by the strikers, and driven from their post of duty, either by physical violence or threats of personal injury. That, during the 5th, 6th and 7th days of July, the strikers, and others acting in sympathy with them, took forcible possession of some of the roads within and adjacent to the city of Chicago, and, by physical force, prevented the passage of trains carrying mails and interstate commerce. That engines and trains of cars were derailed, and passenger trains were assailed with stones and other missiles, as well as the employees in charge of such trains; and in some instances both the passenger cars and engines were fired upon, endangering the lives both of employees and passengers. That these mobs were in many instances led by the strikers or ex-employees of the railway companies, who had gone out of service upon the orders of the defendants as officers of the American Railway Union; and mobs composed of strikers and others were massed at different points, upon the different lines of road, within and adjacent to the city of Chicago, in such numbers as to be beyond the control of the government, state, and municipal authorities. That at least 1,000 freight cars belonging to the railway companies, some of which were loaded with interstate merchandise, were set on fire and destroyed. Signal towers and other appurtenances of the railways were burned. Employees of the railway companies who refused to obey the orders of the defendants and other officers of the American Railway Union, and remained faithful to the discharge of their duty, were violently assaulted, beaten, and bruised, and in some instances were forcibly arrested, and taken from their engines, and kept for hours in confinement. That many lives were also sacrificed—all of which was a direct result of the numerous strikes ordered as aforesaid." (*United States v. Debs*, 64 Fed. 724, 728.)

During the progress of the strike, Debs addressed a letter to the railway managers, a portion of which reads as follows:

"The strike, small and comparatively unimportant in its inception, has extended in every direction, until now it involves or threatens not only every public interest, but the peace, security, and prosperity of our common country. The contest has waged fiercely. It has extended far beyond the limits of interests originally involved, and has laid hold of a vast number of industries and enterprises in no wise responsible for the differences and disagreements that led to the trouble. Factory, mill,

mine and shop have been silenced; widespread demoralization has sway. The interests of multiplied thousands of people are suffering. The common welfare is seriously menaced. The public peace and tranquillity are imperiled. Grave apprehensions for the future prevail." (p. 729.)

In a newspaper interview given during the strike, Debs said:

"We are in condition to keep the strike on for months. Nothing but armed intervention to-day permits the moving of trains. Throughout that great stretch of country which lies west of the Mississippi river our men are steadfast and willing to wait until the bitter end. . . .

"When the command of the so-called 'arteries of commerce' falls into our hands, and the trades unions which have given us comfort require reciprocation from us, we, and we alone, are in a position to give them material assistance." (p. 730.)

What command of the arteries of commerce means was demonstrated in the circumstances under which the Adamson act was passed.

Last year the president of the American Federation of Labor told a committee of congress before which he appeared that limitations on the "right to strike" would not be obeyed, and so made an issue with the government of the United States. Petty exhibitions of arbitrary power are illustrated in the conduct of one Mike Boyle, business agent of an electrical workers' union in Chicago, and known as "Umbrella Mike." He was released from prison, to which he had been committed for criminal conspiracy, on May 8, 1920. Quite promptly he called two strikes against the city, which cut off power at municipal shops, stopped repairs on municipal pumping stations and municipal lighting systems, and stopped city hall elevators. On July 16 he called a strike which stopped operation of surface street-car lines of the city of Chicago, and thousands of wage earners were unable to reach their places of employment.

The Debs pattern has been used as a model for many a subsequent strike. Every section of the country has been made familiar with it. Its ferocity and brutality, and its relation to the public welfare, are portrayed in a recent account of the Alabama coal strike:

"The long drawn out struggle between the coal miners and the coal operators in Alabama has been brought to an end by the agreement of both sides to place the entire case in the hands of Governor Kilby. . . .

"The strike was enormously costly to the state and to the miners, and to the industry in general. . . .

The State, *ex rel.*, v. Howat.

"The strike formally began in September when the union ordered a general stoppage of work in District 20. Much disorder occurred in the strike region, and one miner is alleged to have been lynched. Reports from Alabama announced the suspension of civil rights in the strike zone and the sending of state troops to the field. Miners and their families were evicted from company-owned houses. The union reported that it provided food, clothing and shelter for between forty and fifty thousand men, women, and children. Tent villages were erected on the hillsides after the miners were evicted." (*The Survey*, March 19, 1921.)

Since the conviction of some thirty or more officials and members of the Bridge and Structural Iron Workers' union by a Federal jury at Indianapolis in 1912, dynamite and nitroglycerin have not been so freely used as agents of "industrial justice," but the methods still employed are not less stern. In May, 1919, the milk drivers of Chicago struck. Babies in infant asylums and hospitals cried for milk. On May 15, health commissioner Robertson said:

"We are going to deliver milk to the quarter of a million babies and the 120 hospitals and homes if we have to press into service every police ambulance and every vehicle controlled by the city of Chicago. We have about 250,000 babies under five years of age in Chicago, and 1,000 patients at the Municipal Tuberculosis Sanitarium."

The next day the vice president of the strikers' organization said:

"Yes, picket the places and don't let any milk be delivered. You know how to stop anybody delivering. I don't have to tell you how."

Between April 6, 1917, and November 11, 1918, the period of our participation in the world war, there were more than 6,000 strikes in the United States, some of which imperiled winning the war. When the whole world was shaken by the earthquake of the world war, and the flower of this country went forward as willingly as a bridegroom goes to his bride, to hurl themselves into the raging pit of hell in Western Europe, their fate there depended on patching up strikes at home.

During the war the various war agencies responded, under direction of the president, to the demands of labor with great liberality; but in his message before congress of May 20, 1919, the president said:

"We cannot go any further in our present direction. We have already gone too far. We cannot live our right life as a nation or achieve our proper success as an industrial community if capital and labor are to continue to be antagonistic instead of being partners; if they are to continue

to distrust one another and contrive how they can get the better of one another, or what perhaps amounts to the same thing, calculate by what form and degree of coercion they can manage to extort on the one hand work enough to make enterprise profitable, on the other justice and fair treatment enough to make life tolerable. That bad road has turned out a blind alley. It is no thoroughfare to real prosperity. We must find another leading in another direction and to a very different destination."

The strike record of the year 1919, however, proved to be the most disheartening one in our industrial history. The statistics are amazing, even to minds accustomed to war figures. Millions of men and women were involved. The following is a partial list of the more important strikes and lockouts shown by the government report for 1919:

"A general strike in Tacoma and Seattle in February in sympathy with the metal-trades strikers, in which 60,000 persons were involved; 65,000 employees in the Chicago stockyards struck in August; 100,000 longshoremen along the Atlantic coast struck in October; 100,000 employees in the shipyards of New York City and vicinity struck in October; 115,000 members of the building trades were locked out in Chicago in July; 125,000 in the building trades in New York City struck in February; 250,000 railroad shop workers struck in August; 367,000 iron and steel workers struck in September; and 435,000 bituminous coal miners struck in November. The number of persons concerned in these nine strikes and lockouts was upward of 1,600,000, while the total number of persons involved in strikes and lockouts during 1919 was 4,112,507." (*Monthly Labor Review*, June, 1920, p. 200.)

The direct losses in money amounted to stupendous sums. William Z. Foster, who conducted the steel strike, says that struggle alone cost a billion dollars. The indirect losses were beyond computation. The moral effect was such that school children learned to strike; and the unspeakable crime was committed in Boston when the policemen struck. The plain citizen became so sated with news of strikes and threats of strikes that, unless his morning paper contained an account of some especially shocking strike incident, he yawned and turned to the doings of the Gumps.

The portent of the bituminous coal miners' strike was so grave that the president of the United States pleaded for a rescission of the strike order. Among other things, he said:

"From whatever angle the subject may be viewed, it is apparent that such a strike in such circumstances would be the most far-reaching plan ever presented in this country to limit the facilities of production and distribution of a necessity of life and thus indirectly to restrict the pro-

*J*

duction and distribution of all the necessaries of life. A strike under these circumstances is not only unjustifiable, it is unlawful. . . .

"It is time for plain speaking. These matters with which we now deal touch not only the welfare of a class, but vitally concern the well-being, the comfort, and the very life of all the people. I feel it my duty in the public interest to declare that any attempt to carry out the purpose of this strike and thus to paralyze the industry of the country, with the consequent suffering and distress of all our people, must be considered a grave moral and legal wrong against the government and the people of the United States. I can do nothing less than to say that the law will be enforced, and means will be found to protect the interests of the nation in any emergency that may arise out of this unhappy business."

The president was obliged to find means to avert this grave moral and legal wrong, and the means chosen was a mandatory injunction to withdraw the strike order. The injunction was denounced by the executive council of the American Federation of Labor, as follows: ,

"The autocratic action of our government in these proceedings is of such a nature that it staggers the human mind. In a free country to conceive of a government applying for and obtaining a restraining order prohibiting the officials of a labor organization from contributing their own money for the purpose of procuring food for women and children that might be starving is something that, when known, will shock the sensibilities of man and will cause resentment."

The fact that execution of the strike order would cause tens of thousands of women and children not protected by strike funds to freeze and starve does not appear to have touched any sensibilities of the strike leaders.

District No. 14 of the United Mine Workers of America, comprising the coal-producing counties of Kansas, constitutes a principality, in Kansas but not of it, and ruled by force in medieval fashion. In his testimony given at the trial of this cause, the defendant, Howat, told of calling the strike which constituted contempt of the injunction granted by the district court. A boy named Mishmash, employed in the Mackie mines, discovered he was more than nineteen years old, and claimed back pay, according to union contract, for full miner's wages accruing after he became nineteen. The evidence relating to the date of his birth was inconclusive, and controversy over the matter continued between the district board and the mine owners for a considerable period of time. The amount in dispute was about $225, the boy's mother needed the money,

and the district board believed the mine owners were not acting fairly; therefore a strike was called. Portions of Howat's testimony follow:

"Q. Well, don't you know that if this boy had a claim for wages under a contract that you could recover it in court? A. No; I didn't know it. We never have settled any cases that way.

. . . . . . . . . . . . . .

"Q. You think the boy couldn't collect the money in the courts? A. I couldn't say whether he could or not. I never tried it, and, anyway, we have a contract which provides for it and we wasn't obliged to go to court.

. . . . . . . . . . . . .

"Q. You don't go into court? A. No, sir; neither here nor in the other districts.

. . . . . . . . . . . . .

"Q. You didn't read the injunction? A. No; never did.

. . . . . . . . . . . . .

"Q. You don't recognize courts in the matter of settlement for wages? A. No, sir; we have a contract that covers that.

. . . . . . . . . . . . .

"Q. You don't recognize that contracts are made to be enforced in courts, then? A. No, sir."

Under this form of civil government there were 705 strikes in the coal mines of Kansas within a period of less than four years ending December 31, 1919. In the winter of 1919-'20 the purposes of the national strike were attempted to be carried out in District No. 14. The threatened consequences were so dire that the state took action in this court, under the antitrust statute, and the court appointed receivers for the coal mines. The receivers encountered difficulty in securing competent managing operators, because those who were familiar with the mines and methods of coal production in that district feared they might not survive an attempt to supply the people of the state with fuel. With splendid heroism, ex-service men, college students, and others of patriot mold, volunteered to do the work. Prudence demanded they be given military protection, and a regiment of the Kansas National Guard was sent with them to the mines. General Wood also stationed a troop of regular army soldiers in the vicinity. On the way to Pittsburg, movement of the state troop train was insufferably de-

layed, until a sharp order to proceed was given. Then the train was wrecked. After the volunteers and their military escort arrived at Pittsburg some sniping occurred, but without fatality, some mining machinery was disabled, and some hidden stores of dynamite were discovered. The determined character of the coal-producing enterprise seems then to have been appreciated, and further violence was not offered. The sublimate cruelty of the strike method, however, was displayed in the treatment of the Pittsburg hospital. It was surrounded with coal mines. There were 15,000 idle miners in the district. The hospital was filled with sick, many of whom were miners, and the winter weather was severely cold. Coal was denied to this hospital by the strikers, although deprivation for a single day meant death to patients.

At the beginning of the year 1920 it had not been demonstrated that the world would escape bankruptcy as a result of the war. The problems of economic and industrial reconstruction were not merely local and national, but were international in character. Early hopes of a speedy and easy transition from war to peace conditions were not realized. Instead of that, the situation, always grave, was complicated and aggravated by continued rise in prices, by profiteering, by social unrest fanned by radicalism, and by other ugly influences. The bitterness of the struggle between those who ought to be partners in industry became acute, the only remedy for the high cost of living—joining forces in greater production—was rejected, and economic readjustment promised little but economic turmoil. Under these circumstances, on January 5, 1920, the legislature met in special session at the call of Governor Allen, to consider what it might do to protect the people of the state of Kansas from dislocations in production and distribution of the necessaries of life. The result of its deliberations was the act creating the court of industrial relations.

Recurring to the Alabama coal strike, the fatalistic doctrine of fight in the event of disagreement was acted on, and, after all the disorder and destruction and suffering and death, what happened? An agreement by both sides to place the entire case in the hands of a state officer. If this method of composing disagreements be feasible at all, why fight at all?

The State, *ex rel.*, v. Howat.

Human progress is essentially increase in social well-being, and the primary condition to social well-being is abolition of strife. The Kansas statute provides a permanent board of state officers, sitting all the time, to receive submission of differences and adjust them, without expense to either disputant. Members of the board are not arbitrators. In actual practice, a board of arbitration is too frequently a jury packed on both sides. In any event, its verdict is a compromise, and the public interest is not taken into consideration. The court of industrial relations sits to administer industrial justice, and its facilities for doing so are complete. Its command of data and of aids to sound conclusion includes everything that both business and government are able to supply. It supplants no type of shop committee, no mutual-interest department of any business organization, and no principle of voluntary adjustment. Its intention is to prevent strife in case of disagreement, by promulgation of just, reasonable and lawful regulations, and it must be classified as an instrument of social progress. With a tribunal of this kind to appeal to, disputants have no moral right, and have no economic excuse, for fighting after failing to agree.

Sometimes under stress of genuine emotion, sometimes in rant, and sometimes in misguided ignorance, labor speaks of its "right" to strike as God-given. Right to strike is God-given in the same sense that right indicated by the word "property" is God-given. They both developed naturally out of the relation of man to his environment, including other men. The primitive man claimed the game he killed, because it was necessary to his survival. This ownership extended to the flints he chipped, the arrows he barbed, and other things on which he depended for existence. Consciousness that a fight and probable injury would result induced other men to refrain from interfering with his possession. The practice grew into an overtly admitted claim. The practice became habitual, then customary and general, and finally crystallized into a rule, simply through a feeling that the rule possessed obligatory force. When legal institutions were set up, the sphere of self-help in enforcing the rule was very greatly narrowed. The right to strike grew up in precisely the same way. Quitting work, first permanently, and then with the expectation of re-

suming, was found by experience to produce a result which served an end. The practice of quitting work grew as the satisfaction was more often desired. The practice so fitted into the scheme of relations that it became recognized as rightful, and was protected by law. It has served as a rude but valuable weapon in the attainment of justice, and has been a positive factor contributing to social progress. As in the case of property, abuse and misuse are not to be tolerated.

In Alabama, the whole controversy which the strike left unsettled was placed in the hands of the governor by agreement. The government of District No. 14, United Mine Workers of America, fines its officers $5,000 each, and fines its subjects $50 each, for recognizing the court of industrial relations. In case of disagreement, there is no remedy but fight. To a fair-minded person standing in the midst of the ruin wrought by a strike, it would seem the state might be interested in the mining business, in the miner, and in the man who needs coal, and might lawfully do something for each, before conflagration is started by the strike torch—the inevitable conflagration, whether the torch be applied by mine owner or by striker. Must Alabama wait until mine owner and miner see fit to go to Governor Kilby? Must Kansas be driven to operate coal mines by volunteers, under the protection of troops, in order to keep her public institutions going, and in order that her people may have fuel in winter?

It seems to this court to be quite remarkable that public interest in affairs of this kind should now be challenged by anybody—but the challenge is made, and its grounds may be briefly considered.

Strangely enough, this gingham-dog and calico-cat business of eating each other up is defended under a constitution ordained and established "to insure domestic tranquillity." The mine owner vociferates "Property!" The miner shouts "Liberty!" Meanwhile, riot and bloodshed are rampant. Homeless women and children of District No. 20 watch the battle from tents on the hillside, and the nurse at the Pittsburg hospital feels her own heart freeze as she watches the temperature of her patient's room go down.

It is scarcely necessary to cite decisions to the effect that, in this country, every man holds all his rights and privileges subject to lawful interference by the state. The strike privilege

was not conferred by any constitution or by any statute. It developed in the field of the common law, and normally should be subject to legislative regulation.

The worker tells the story of the intolerable grievances he has suffered, his helplessness in a contest with organized and syndicated capital, the necessity for combining with his fellows, and the desperation which drove them to strike. The story is true in all its details; but there is a final chapter. The public began to take an interest in strikes long ago. Sympathy was likely to be with the under dog, who was likely to be entitled to his bone, and pressure of public opinion became a valuable ally of striking workmen. Then, in many instances, public inconvenience was deliberately contrived, and the relation which the typical strike ultimately bore to public welfare is revealed by the instances cited at the beginning of this discussion. The wailing of children starving for milk fell on deaf ears in Chicago.

It is said that a man is a slave unless he may quit work. The assertion is ambiguous. If it refers to striking, which is not abandonment of the employer's service at all, it is untrue. If it refers to leaving the employer's service, it is still untrue. A train crew may rightfully be forbidden to leave a trainload of passengers between stations. Probably, identification of striking with leaving the employer's service under circumstances not so exceptional, is intended. In that sense the assertion is an abuse of language and, if made by a person capable of clarity of thought and clarity of expression, can accomplish no purpose except to obscure the truth.

It is said the worker has a right to leave his employer's service, and what he may rightfully do he may do with others having the same right. For obvious reasons of public policy, the privilege to discontinue personal service must be unrestrained. Every purpose of the policy is fulfilled by exercise of the privilege. When a worker undertakes to induce others to break their relationship with their employer, he steps outside the limits of the privilege which is essential to selfhood. He interferes in the affairs of others, and in a matter which bears no relation to his own personal privilege to work or quit work. The consequences are not those which follow from exercise of his own privilege, and they are to be appraised without reference to that privilege. When a worker confederates with oth-

ers to leave service in a body, he steps outside the limits of privilege essential to selfhood. It requires no confederacy to enable him to quit work, and so escape servitude. Confederating being something which is outside of and unrelated to personal privilege to quit work, it is to be judged according to consequence and motive. In case of a strike, the object of the confederacy is not to preserve or to protect the privilege to quit work and be free. That privilege is already unrestrained. The object is to coerce the employer by the multiplied power of combined action, and to coerce him in respect to something which bears no relation to unrestrained privilege to quit work. Conduct of the worker, therefore, has ceased to be individual and personal. It presents a social aspect; and when conduct becomes social, government takes an interest. If the general welfare be affected, government may take action.

It is said that organized labor is a part of the public, and the public has no rights superior to the toiler's right to live and to defend himself against oppression.

It is gratifying to know that the public has close relation to organized labor. Nobody disputes the toiler's right to live, or right to defend himself against oppression. If the assertion means the public has no rights superior to organized labor's right to strike, it would seem government, as the representative of the unorganized portion of the public, will be obliged to join a labor union, in order to obtain opportunity to work for the general welfare.

Let nobody be deceived concerning the relation of the strike to government. In the opinion in the Debs case, the court pointed to the attempted exercise by individuals of powers belonging to government alone. Last year, at the time of the Polish crisis, the Chicago Federation of Labor passed a resolution urging American labor bodies to prevent mobilization of military or naval forces to assist Poland. Congress passed the Adamson law. The city of Boston must be delivered over to looting by mobs of thugs unless officers, who should have no interest except the public safety, may have the privilege of affiliating with the American Federation of Labor. The great city of Chicago must deal with "Umbrella Mike" in order to discharge its municipal functions. Alexander Howat does not recognize courts.

The State, *ex rel.*, v. Howat.

It is said that mitigation of the barbarity of the strike will be a step backward. In other departments of human interest we adopt measures to prevent misery and woe. The court of industrial relations is an industrial prophylactic, and the use of prophylactics has not heretofore been regarded as reactionary. In no other human relation is public brawling regarded as a public good; in no other human relation is the Higher Law a law of force; and the figure of the head of organized labor in the United States prescribing the limits of obedience to law in the name of unregulated force, calls to mind the figure of the former emperor of Germany, who, on a public occasion, said: "There is only one master in this country. I am he, and I will not tolerate another"; and who later said, "Those who try to interfere with my tasks I shall crush."

It has seemed necessary to say thus much concerning the so-called "right" to strike, because of the earnestness, and in some instances the extravagance, with which it is defended. Let it be made plain here and now that the court champions no favorite in the so-called industrial conflict. On other occasions the court has spoken frankly of the inhumanity of departments of the modern industrial system, and of the cruelties which have accompanied industrial growth. Waste of human life and limb, and the casting upon society of cripples, human derelicts, and widows and orphans without means of support, were almost a feature of the conduct of some industries; and laws such as the factory act, the workmen's compensation act, and other remedial measures, were opposed with the utmost vehemence. The mining industry is not guiltless. Some who have engaged in it had no conception of public service. They mined coal for profit. They were interested in limited production, because it was believed to occasion high prices. They were not greatly concerned about cost, because the public paid the bills. This attitude resulted in chronic mismanagement, and they had no part in what they regarded as sentimental movements for amelioration. Miners were exploited through overwork and underpay, through company stores and oppressive regulations, through inadequate safeguards and accidents which took the form of holocausts, through bad sanitation and bad housing, and through long and unnecessary periods of enforced idleness. The miner had no

capital except his capacity to labor. His situation was such that he was obliged to accept whatever terms.and working conditions were offered him. His "liberty" to quit work and go elsewhere if not satisfied with his employer's terms was pure myth and mockery. He could not even get in touch with the superintendent to talk over his grievances. If by some fortuity he did so, and contended too long or too strenuously, he was discharged and, if an American citizen, it was likely his place was taken by a foreign immigrant. As an individual he was helpless; but he had to live. His only remedy appeared to be to, federate with others, and take such drastic action as would extort from his employer some measure of relief from conditions which could not be endured. Other chapters of our industrial history contain nothing which does not deserve praise, and they prompt eulogies of the fine spirit and attitude, the co-operative relationship, and the splendid achievements of American capital and American labor. To indulge the prompting here would serve no purpose, because, as was said in the beginning, the act creating the court of industrial relations was justified, or was not justified, by ominous facts, some of which the court was compelled to state on this record.

The law applicable to the facts may be sketched as briefly as possible. Some centuries ago it was found expedient, in the country from which our legal institutions were derived, to regulate business in the interest of the public welfare. Some regulations were unwise and ineffective. Others served their purpose, and then fell into disuse because of changed conditions. The trend of economic development was such that for a long time regulation of business was practically dormant, and economic theory was framed accordingly; but there never was a time when legal theory forbade regulation, if public inconvenience and public oppression demanded it. Sometimes it was public health which required intervention, and sometimes public safety; but business was frequently regulated simply because it was "affected with a public interest." Our colonial history furnishes instances of such regulation, and it was not unfamiliar to framers of the constitution of the United States. When it is said, therefore, that the act of 1920 is a discredited and discarded form of interference with private business, brought from the lumber room of the remote past, the essence

of the matter is not touched. Organized government has never been without power to make regulations whenever the conduct of business threatened public harm, and the power has been exercised as occasion required. Reservation to the states, in the constitution of the United States, of the police power, and limitations on exercise of that power, are subjects of familiar law. In 1876 the decision in *Munn v. Illinois*, 94 U. S. 113, was rendered. That decision was followed by determined reactionary efforts to limit its application to definite classes of business—business involving use of property, business enjoying a franchise, business enjoying a monopoly. These and other efforts to limit, and even to overthrow, the doctrine of the Munn case, failed, and all the arguments by which they were sustained were refuted in the opinion in the case of *German Alliance Ins. Co. v. Kansas*, 233 U. S. 389—a landmark in the progress of the law almost as noteworthy as the case of *Munn v. Illinois*.

Eminent counsel representing employers of labor in industries affected by the act of 1920 were invited to file briefs in this case, and the court gratefully acknowledges the benefit of their very candid and very forceful criticisms of the act. Their chief contentions, including the *in terrorem* argument that constitutional government is jeopardized and all the affairs of life may be regulated if the Munn case be applied to any new subject, are so fully met by the decision in the Insurance Company case that space will be given to an extended quotation from the opinion:

"In some degree the public interest is concerned in every transaction between men, the sum of the transactions constituting the activities of life. But there is something more special than this, something of more definite consequence, which makes the public interest that justifies regulatory legislation. We can best explain by examples. The transportation of property—business of common carriers—is obviously of public concern and its regulation is an accepted governmental power. The transmission of intelligence is of cognate character. There are other utilities which are denominated public, such as the furnishing of water and light, including in the latter gas and electricity. We do not hesitate at their regulation nor at the fixing of the prices which may be charged for their service. The basis of the ready concession of the power of regulation is the public interest. This is not denied, but its application to insurance is so far denied as not to extend to the fixing of rates. It is said the state has no power to fix the rates charged to the public by either corporations or individuals engaged in a private

business, and the 'test of whether the use is public or not is whether a public trust is imposed upon the property and whether the public has a legal right to the use which cannot be denied'; or, as we have said, quoting counsel, 'Where the right to demand and receive service does not exist in the public, the correlative right of regulation as to rates and charges does not exist.' Cases are cited which, it must be admitted, support the contention. The distinction is artificial. It is, indeed, but the assertion that the cited examples embrace all cases of public interest. The complainant explicitly so contends, urging that the test it applies excludes the idea that there can be a public interest which gives the power of regulation as distinct from a public use which, necessarily, it is contended, can only apply to property, not to personal contracts. The distinction, we think, has no basis in principle (*Noble State Bank v. Haskell,* 219 U. S. 104), nor has the other contention that the service which cannot be demanded cannot be regulated.

"*Munn v. Illinois,* 94 U. S. 113, is an instructive example of legislative power exerted in the public interest. The constitution of Illinois declared all elevators or storehouses, where grain or other property was stored for a compensation, to be public warehouses, and a law was subsequently enacted fixing rates of storage. In other words, that which had been private property had from its uses become, it was declared, of public concern and the compensation to be charged for its use prescribed. The law was sustained against the contention that it deprived the owners of the warehouses of their property without due process of law. We can only cite the case and state its principle, not review it at any length. The principle was expressed to be, quoting Lord Chief Justice Hale, 'that when private property is "affected with a public interest it ceases to be *juris privati*" only' and it becomes 'clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large'; and, so using it, the owner 'grants to the public an interest in that use, and must submit to be controlled by the public for the common good.' And it was said that the application of the principle could not be denied because no precedent could be found for a statute precisely like the one reviewed. It presented a case, the court further said, 'for the application of a long-known and well-established principle in social science, and this statute simply extends the law so as to meet this new development of commercial progress.' The principle was expressed as to property, and the instance of its application was to property, but it is manifestly broader than that instance. It is the business that is the fundamental thing; property is but its instrument, the means of rendering the service which has become of public interest.

"That the case had broader application than the use of property is manifest from the grounds expressed in the dissenting opinion. The basis of the opinion was that the business regulated was private and had 'no special privilege connected with it, nor did the law ever extend to it any greater protection than it extended to all other private business.' The argument encountered opposing examples, among others, the

regulation of the rate of interest on money. The regulation was accounted for on the ground that the act of Parliament permitting the charging of some interest was a relaxation of a prohibition of the common law against charging any interest, but this explanation overlooked the fact that both the common law and the act of Parliament were exercises of government regulation of a strictly private business in the interest of public policy, a policy which still endures and still dictates regulating laws. Against that conservatism of the mind, which puts to question every new act of regulating legislation and regards the legislation invalid or dangerous until it has become familiar, government—state and national—has pressed on in the general welfare; and our reports are full of cases where in instance after instance the exercise of regulation was resisted and yet sustained against attacks asserted to be justified by the constitution of the United States. The dread of the moment having passed, no one is now heard to say that rights were restrained or their constitutional guaranties impaired.

"*Munn v. Illinois* was approved in many state decisions, but it was brought to the review of this court in *Budd v. New York*, 143 U. S. 517, and its doctrine, after elaborate consideration, reaffirmed, and against the same arguments which are now urged against the Kansas statute. Nowhere have these arguments been, or could be, advanced with greater strength and felicity of expression than in the dissenting opinion of Mr. Justice Brewer. Every consideration was adduced, based on the private character of the business regulated and, for that reason, its constitutional immunity from regulation, with all the power of argument and illustration of which that great judge was a master. The considerations urged did not prevail. Against them the court opposed the ever-existing police power in government and its necessary exercise for the public good and declared its entire accommodation to the limitations of the constitution. The court was not deterred by the charge (repeated in the case at bar) that its decision had the sweeping and dangerous comprehension of subjecting to legislative regulation all of the businesses and affairs of life and the prices of all commodities. Whether we may apprehend such result by extending the principle of the cases to fire insurance we shall presently consider.

"In *Brass v. Stoeser*, 153 U. S. 391, *Munn v. Illinois* and *Budd v. New York* were affirmed. A law of the state of North Dakota was sustained which made all buildings, elevators and warehouses used for the handling of grain for a profit public warehouses, and fixed a storage rate. The case is important. It extended the principle of the other two cases and denuded it of the limiting element which was supposed to beset it—that to justify regulation of a business the business must have a monopolistic character. That distinction was pressed and answered. It was argued, the court said (p. 402), 'that the statutes of Illinois and New York [passed on in the Munn and Budd cases] are intended to operate in great trade centers, where, on account of the business being localized in the hands of a few persons in close proximity to each other, great opportunities for combinations to raise and control elevating and

storage charges are afforded, while the wide extent of the state of North Dakota and the small population of its country towns and villages are said to present no such opportunities.' And it was also urged that the method of carrying on business in North' Dakota and the eastern cities was different, that the elevators in the latter were essentially means of transporting grain from the lakes to the railroads and those who owned them could, if uncontrolled by law, extort such charges as they pleased, and stress was laid upon the 'expression in the other cases which represented the business as a practical monopoly. A contrast was made between those conditions and those which existed in an agricultural state where land was cheap and limitless in quantity. It was replied that this difference in conditions was 'for those who make, not for those who interpret, the laws.' And considering the expressions in the other cases which, it was said, went rather to the expediency of the laws, than to their validity, yet, it was further said, the expressions had their value because the 'obvious aim of the reasoning that prevailed was to show that the subject-matter of these enactments fell .within the legitimate sphere of legislative power, and that, so far as the laws and constitution, of the United States were concerned, the legislation in question deprived no person of his property without due process of law.' (p. 404.)

"The cases need no explanatory or fortifying comment. They demonstrate that a business, by circumstances and its nature, may arise from private to be of public concern and be subject, in consequence, to governmental regulation. And they demonstrate, to apply the language of Judge Andrews in *People v. Budd* (117 N. Y. 1, 27), that the attempts made to place the right of public regulation in the cases in which it has been exerted, and of which we have given examples, upon the ground of special privilege conferred by the public on those affected cannot be supported. 'The underlying principle is that business of certain kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation.' . . . It would be a bold thing to say that the principle is fixed, inelastic, in the precedents of the past, and cannot be applied though modern economic conditions may make necessary or beneficial its application. In other words, to say that government possessed at one time a greater power to recognize the public interest in a business and its regulation to promote the general welfare than government possesses to-day." (*German Alliance Ins. Co. v. Kansas*, 233 U. S. 389, 406-411.)

The legislature was of the opinion the industries specified in section 3 of the act of 1920 are affected with a public interest, and so declared. The declaration did not make them so. Whether they are or not depends on their relation to public interest. Without presenting the facts, of which the court takes judicial knowledge, concerning the peculiar relation the product of the Kansas coal mines bears to the state's fuel supply, and without discussing further the peculiar conditions under which

production is accomplished, the court concludes the business of producing coal bears an intimate relation to the public peace, good order, health and welfare; that such business is affected with a public interest; and that such business may be regulated, to the end that reasonable continuity and efficiency of production may be maintained.

The mills of Kansas stand to-day "at the gateway of commerce" more prominently than did private elevators forty-five years ago. Great packing plants, belonging to what the Federal trade commission calls the "Big Five," are located in Kansas. Many smaller packing companies operate plants within the state, and the meat-packing industry effectively dominates not only a food supply, but one of the great industries of the state—the live-stock industry. There are other reasons for regulation, which need not be specified because the issues in this case involve production of fuel only; but the manufacture of food products is mentioned to show the precarious ground on which the state stands in respect to its supply of the necessities of life in case of emergency.

The business of producing coal being affected with a public interest to an extent authorizing reasonable regulation, is the act of 1920 such a regulation? The defendants contend that it is not, because it destroys liberty of contract.

The offending provision of the act is section 9. The section begins with the recognition of approved general principles which ought to be applied in the regulation of industry. It then makes acknowledgment of the right of free choice of employment and of the right to make and carry out fair, just and reasonable contracts and agreements of employment. The section concludes as follows:

"If, during the continuance of any such employment, the terms or conditions of any such contract or agreement hereafter entered into, are by said court, in any action or proceeding properly before it under the provisions of this act, found to be unfair, unjust or unreasonable, said court of industrial relations may by proper order so modify the terms and conditions thereof so that they will be and remain fair, just and reasonable and all such orders shall be enforced as in this act provided."

The argument in opposition to validity of the section is marred by the interlarding of imputations to the regulating body of authority to act arbitrarily, to act according to its pleasure, to act according to its will, to act according to its

whim. The legislature granted no such authority, and the fair presumption is that public officers in such an important station will not abuse their trust. The point is made, however, that workmen have the privilege of exercising their own judgment with respect to the fairness, justness, and reasonableness of engagements with employers, and that contracts under which they work, satisfactory to themselves and to their employers, are not subject to modification or abrogation by the court of industrial relations. The argument misconceives the meaning of the section; and in order to present the proper interpretation of the section, it will be necessary to relate it to the general scheme of the law.

The legislature was moved to take action by circumstances and by events which have been narrated. They disclosed the helplessness of the people in an emergency, and the purpose was to be prepared in the future for any emergency. It would be folly to wait until it is again necessary to call out troops. Measures of preparedness are fair subjects of legislative choice, within the well-understood constitutional limitations. The subjects chosen were the necessaries of life. The extent of the regulation, so far as it affects the defendants, was protection of reasonable continuity and efficiency of production. Production is fundamental: there can be no distribution or consumption until there has been production. Continuous production, and production according to the approval of an efficiency expert, are not required at all. Only that continuity and efficiency are required which will secure the people from privation and oppression. Limiting production and withdrawing from production are expressly permitted, for any purpose which does not contemplate circumvention of the law. The court of industrial relations, however, has oversight of production all the time. Jurisdiction is not suspended from crisis to crisis. If the court must wait until the evils of a crisis have been suffered, the statute is nugatory. Should authority be too zealously manifested in improper or unwarranted interference, the particular orders are subject to review, and may be annulled. A controversy between employer and workers, or between groups or crafts of workers, which endangers production, creates an emergency, with which the court may deal on its own motion, or on complaint. It may make temporary

orders to preserve the peace and to protect private and public interests pending investigation. After investigation, the court makes and serves on the parties to the controversy findings on which orders may be based settling and adjusting the controversy. The nature of the court's action depends on the result of the investigation, and its determination of the controversy extends no further than the purpose of the act requires. Orders, pursuant to findings, respecting all the common subjects of industrial controversy, are authorized. Every order made is essentially an emergency order, and continues in force only for such reasonable time, to be fixed by the court, as may be necessary to avert danger. If, after experiment, either party to the controversy finds the order unreasonable or impracticable, application may be made for modification. Any order is subject to change by agreement between the parties to the controversy, with approval of the court. This approval extends merely to seeing that a contract shall not be made use of to defeat the policy of the statute. Collective bargaining, by unions or associations of workers, whether incorporated or unincorporated, is expressly recognized. In case of contumacy, the court is authorized to take over the coal mines, by proper proceedings, and control and operate them.

Section 9 does not authorize a general revision of labor contracts. In congruity with other sections, it does no more than provide that contracts shall not thwart achievement of the public purposes of the statute. No contract may be modified except in an action or proceeding properly before the court, that is, an action or proceeding relating to a controversy. If, in dealing with the emergency created by a controversy, the court encounters a contract which would hamper the making of a necessary order, the contract may be treated as any other element of the situation. No contract is to be regarded as unfair, unjust, or unreasonable, that is not an impediment to settlement of a controversy, and orders respecting contracts of the obstructive character are merely ancillary to determination of the controversy. The power exercised in making such orders is the same power which takes entire charge of a mine and operates it during an emergency.

Section 17 makes unlawful conspiracy to quit employment and to induce others to quit, picketing, and the bludgeoning of

those who want to work, whether employees or not, by abuse, intimidation, and threat, for the purpose of accomplishing that which the statute was designed to prevent. It is said this section destroys collective bargaining. Collective bargaining is bargaining by an organization or group of workmen, on behalf of its members, with the employer. That privilege is not only protected, but may be exercised, and is expected to be exercised, even to the extent of altering orders of the court of industrial relations. What the defendants contend for is license to conspire to injure the public.

It is said the act of 1920 is void because it trenches on personal liberty. The personal liberty contended for is liberty to leave the employer's service. All the leading cases in which the principle involved have been discussed are cited. It is not necessary to review them. The statute expressly guards the privilege of any employee to quit his employment at any time. He may quit before controversy arises, when controversy arises, while controversy is raging, and after controversy has been adjusted. As many others as desire may do likewise, and they may do so as the result of mutual-interest consultations. No employee may, however, transgress the limits of his personal privilege, as defined earlier in this opinion, for the purpose of limiting or suspending production, contrary to the provisions of the act.

Reference is made to cases discussing an employer's privilege to discharge workmen. The statute contains just one provision touching that subject. In order to protect jurisdiction and authority of the court of industrial relations, it is made unlawful to discharge a workman for complaining to or testifying before the court. In no other respect is the employer's right to "hire and fire" restricted. The defendants are not interested in the provision referred to. If they were, and if the provision were invalid, it would not vitiate the valid portions of the statute. Understanding the pioneer character of its work, the legislature framed the statute so that any invalid provision—not section, but provision (section 28)—may be eliminated without affecting others. This rule of interpretation extends to application of the same provision to different subjects.

Heretofore the industrial relationship has been tacitly regarded as existing between two members—industrial manager, and industrial worker.  They have joined whole-heartedly in excluding others.  The legislature proceeded on the theory there is a third member of those industrial relationships which have to do with production, preparation and distribution of the necessaries of life—the public.  The legislature also proceeded on the theory the public is not a silent partner.  Whenever the dissensions of the other two become flagrant, the third member may see to it the business does not stop.  The privilege of industrial managers to organize is not disputed.  The privilege of industrial workers to organize is expressly recognized. Collective bargaining between the two organizations is not only encouraged, but is in effect placed on the plane of duty. The rights of society as a whole, however, are dominant over industry; and the state is under obligation to intervene to compel settlement of differences whenever failure of manager and laborer to agree endangers the public safety or causes general distress.

The judgment of the district court is affirmed.

---

CHAPTER 29, SPECIAL SESSION LAWS OF 1920.

AN ACT creating the Court of Industrial Relations, defining its powers and duties, and relating thereto, abolishing the Public Utilities Commission, repealing all acts and parts of acts in conflict therewith, and providing penalties for the violation of this act.

*Be it enacted by the Legislature of the State of Kansas:*

SECTION 1.  There is hereby created a tribunal to be known as the Court of Industrial Relations, which shall be composed of three judges who shall be appointed by the governor by and with the advice and consent of the Senate.  Of such three judges first appointed, one shall be appointed for a term of one year, one for a term of two years, and one for a term of three years, said terms to begin simultaneously upon qualification of the persons appointed therefor.  Upon the expiration of the term of the three judges first appointed as aforesaid, each succeeding judge shall be appointed and shall hold his office for a term of three years and until his successor shall have been qualified.  In case of a vacancy in the office of judge of said Court of Industrial Relations the governor shall appoint his successor to fill the vacancy for the unexpired term. The salary of each of said judges shall be five thousand dollars per

year, payable monthly. Of the judges first to be appointed, the one appointed for the three-year term shall be the presiding judge, and thereafter the judge whose term of service has been the longest shall be the presiding judge: *Provided*, That in case two or more of said judges shall have served the same length of time, the presiding judge shall be designated by the governor.

. SEC. 2. The jurisdiction conferred by law upon the Public Utilities Commission of the state of Kansas is hereby conferred upon the Court of Industrial Relations, and the said Court of Industrial Relations is hereby given full power, authority and jurisdiction to supervise and control all public utilities and all common carriers as defined in sections 8329 and 8330 of the General Statutes of Kansas for 1915, doing business in the state of Kansas, and is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction. All laws relating to the powers, authority, jurisdiction and duties of the Public Utilities Commission of this state are hereby adopted and all powers, authority, jurisdiction and duties by said laws imposed and conferred upon the Public Utilities Commission of this state relating to common carriers and public utilities are hereby imposed and conferred upon the Court of Industrial Relations created under the provisions of this act; and in addition thereto said Court of Industrial Relations shall have such further power, authority and jurisdiction and shall perform such further duties as are in this act set forth, and said Public Utilities Commission is hereby abolished. That all pending actions brought by or against the said Public Utilities Commission of this state shall not be affected, but the same may be prosecuted or defended by and in the name of the Court of Industrial Relations. Any investigation, examination, or proceedings had or undertaken, commenced or instituted by or pending before said Public Utilities Commission at the time of the taking effect of this act are transferred to and shall be continued and heard by the said Court of Industrial Relations hereby created, under the same terms and conditions and with like effect as though said Public Utilities Commission had not been abolished.

SEC. 3. (*a*) The operation of the following named and indicated employments, industries, public utilities and common carriers is hereby determined and declared to be affected with a public interest and therefore subject to supervision by the state as herein provided for the purpose of preserving the public peace, protecting the public health, preventing industrial strife, disorder and waste, and securing regular and orderly conduct of the businesses directly affecting the living conditions of the people of this state and in the promotion of the general welfare, to wit: (1) The manufacture or preparation of food products whereby, in any stage of the process, substances are being converted, either partially or wholly, from their natural state to a condition to be used as food for human beings; (2) The manufacture of clothing and all manner of wearing apparel in common use by the people of this state whereby, in any stage of the process, natural products are being

converted, either partially or wholly, from their natural state to a condition to be used as such clothing and wearing apparel; (3) The mining or production of any substance or material in common use as fuel either for domestic, manufacturing, or transportation purposes; (4) The transportation of all food products and articles or substances entering into wearing apparel, or fuel, as aforesaid, from the place where produced to the place of manufacture or consumption; (5) All public utilities as defined by section 8329, and all common carriers as defined by section 8330 of the General Statutes of Kansas of 1915. ·

(*b*) Any person, firm or corporation engaged in any such industry or employment, or in the operation of such public utility or common carrier, within the state of Kansas, either in the capacity of owner, officer, or worker, shall be subject to the provisions of this act, except as limited by the provisions of this act.

SEC. 4. Said Court of Industrial Relations shall have its office at the capital of said state in the city of Topeka, and shall keep a record of all its proceedings which shall be a public record and subject to inspection the same as other public records of this state. Said court, in addition to the powers and jurisdiction heretofore conferred upon, and exercised by, the Public Utilities Commission, is hereby given full power, authority and jurisdiction to supervise, direct and control the operation of the industries, employments, public utilities, and common carriers in all matters herein specified and in the manner provided herein, and to do all things needful for the proper and expeditious enforcement of all the provisions of this act.

SEC. 5. Said Court of Industrial Relations is hereby granted full power to adopt all reasonable and proper rules and regulations to govern its proceedings, the service of process, to administer oaths, and to regulate the mode and manner of all its investigations, inspections and hearings: *Provided, however,* That in the taking of testimony the rules of evidence, as recognized by the supreme court of the state of Kansas in original proceedings therein, shall be observed by said Court of Industrial Relations; and testimony so taken shall in all cases be transcribed by the reporter for said Court of Industrial Relations in duplicate, one copy of said testimony to be filed among the permanent records of said court, and the other to be submitted to said supreme court in case the matter shall be taken to said supreme court under the provisions of this act.

SEC. 6. It is hereby declared and determined to be necessary for the public peace, health and general welfare of the people of this state that the industries, employments, public utilities and common carriers herein specified shall be operated with reasonable continuity and efficiency in order that the people of this state may live in peace and security, and be supplied with the necessaries of life. No person, firm, corporation, or association of persons shall in any manner or to any extent, willfully hinder, delay, limit or suspend such continuous and efficient operation for the purpose of evading the purpose and intent of the provisions of

this act; nor shall any person, firm, corporation, or association of persons do any act or neglect or refuse to perform any duty herein enjoined with the intent to hinder, delay, limit or suspend such continuous and efficient operation as aforesaid, except under the terms and conditions provided by this act.

SEC. 7. In case of a controversy arising between employers and workers, or between groups or crafts of workers, engaged in any of said industries, employments, public utilities, or common carriers, if it shall appear to said Court of Industrial Relations that said controversy may endanger the continuity or efficiency of service of any of said industries, employments, public utilities or common carriers, or affect the production or transportation of the necessaries of life affected or produced by said industries or employments, or produce industrial strife, disorder or waste, or endanger the orderly operation of such industries, employments, public utilities or common carriers, and thereby endanger the public peace or threaten the public health, full power, authority and jurisdiction are hereby granted to said Court of Industrial Relations, upon its own initiative, to summon all necessary parties before it and to investigate said controversy, and to make such temporary findings and orders as may be necessary to preserve the public peace and welfare and to preserve and protect the status of the parties, property and public interests involved pending said investigations, and to take evidence and to examine all necessary records, and to investigate conditions surrounding the workers, and to consider the wages paid to labor and the return accruing to capital, and the rights and welfare of the public, and all other matters affecting the conduct of said industries, employments, public utilities or common carriers, and to settle and adjust all such controversies by such findings and orders as provided in this act. It is further made the duty of said Court of Industrial Relations, upon complaint of either party to such controversy, or upon complaint of any ten citizen taxpayers of the community in which such industries, employments, public utilities or common carriers are located, or upon the complaint of the attorney-general of the state of Kansas, if it shall be made to appear to said court that the parties are unable to agree and that such controversy may endanger the continuity or efficiency of service of any of said industries, employments, public utilities or common carriers, or affect the production or transportation of the necessaries of life affected or produced by said industries or employments, or produce industrial strife, disorder or waste, or endanger the orderly operation of such industries, employments, public utilities or common carriers, and thereby endanger the public peace or threaten the public health, to proceed and investigate and determine said controversy in the same manner as though upon its own initiative. After the conclusion of any such hearing and investigation, and as expeditiously as possible, said Court of Industrial Relations shall make and serve upon all interested parties its findings, stating specifically the terms and conditions upon which said industry, employment, utility or common carrier should be thereafter conducted in so far as the matters determined by said court are concerned.

The State, *ex rel.*, v. Howat.

SEC. 8. The Court of Industrial Relations shall order such changes, if any, as are necessary to be made in and about the conduct of said industry, employment, utility or common carrier, in the matters of working and living conditions, hours of labor, rules and practices, and a reasonable minimum wage, or standard of wages, to conform to the findings of the court in such matters, as provided in this act, and such orders shall be served at the same time and in the same manner as provided for the service of the court's findings in this act: *Provided*, All such terms, conditions and wages shall be just and reasonable and such as to enable such industries, employments, utilities or common carriers to continue with reasonable efficiency to produce or transport their products or continue their operations and thus to promote the general welfare. Service of such order shall be made in the same manner as service of notice of any hearing before said court as provided by this act. Such terms, conditions, rules, practices, wages, or standard of wages, so fixed and determined by said court and stated in said order, shall continue for such reasonable time as may be fixed by said court, or until changed by agreement of the parties with the approval of the court. If either party to such controversy shall in good faith comply with any order of said Court of Industrial Relations for a period of sixty days or more, and shall find said order unjust, unreasonable or impracticable, said party may apply to said Court of Industrial Relations for a modification thereof and said Court of Industrial Relations shall hear and determine said application and make findings and orders in like manner and with like effect as originally. In such case the evidence taken and submitted in the original hearing may be considered.

SEC. 9. It is hereby declared necessary for the promotion of the general welfare that workers engaged in any of said industries, employments, utilities or common carriers shall receive at all times a fair wage and have healthful and moral surroundings while engaged in such labor; and that capital invested therein shall receive at all times a fair rate of return to the owners thereof. The right of every person to make his own choice of employment and to make and carry out fair, just and reasonable contracts and agreements of employment, is hereby recognized. If, during the continuance of any such employment, the terms or conditions of any such contract or agreement hereafter entered into, are by said court, in any action or proceeding properly before it under the provisions of this act, found to be unfair, unjust or unreasonable, said Court of Industrial Relations may by proper order so modify the terms and conditions thereof so that they will be and remain fair, just and reasonable and all such orders shall be enforced as in this act provided.

SEC. 10. Before any hearing, trial or investigation shall be held by said court, such notice as the court shall deem necessary shall be given to all parties interested by registered U. S. mail addressed to said parties to the post office of the usual place of residence or business of said interested parties when same is known, or by the publication of notice in some newspaper of general circulation in the county in which said industry or employment, or the principal office of such utility or common

carrier is located, and said notice shall fix the time and place of said investigation or hearing. The costs of publication shall be paid by said court out of any funds available therefor. Such notice shall contain the substance of the matter to be investigated, and shall notify all persons interested in said matter to be present at the time and place named to give such testimony or to take such action as they may deem proper.

SEC. 11. Said Court of Industrial Relations may employ a competent clerk, marshal, shorthand reporter, and such expert accountants, engineers, stenographers, attorneys and other employees as may be necessary to conduct the business of said court; shall provide itself with a proper seal and shall have the power and authority to issue summons and subpœnas and compel the attendance of witnesses and parties and to compel the production of the books, correspondence, files, records, and accounts of any industry, employment, utility or common carrier, or of any person, corporation, association or union of employees affected, and to make any and all investigations necessary to ascertain the truth in regard to said controversy. In case any person shall fail or refuse to obey any summons or subpœna issued by said court after due service then and in that event said court is hereby authorized and empowered to take proper proceedings in any court of competent jurisdiction to compel obedience to such summons or subpœna. Employees of said court whose salaries are not fixed by law shall be paid such compensation as may be fixed by said court, with the approval of the governor.'

SEC. 12. In case of the failure or refusal of either party to said controversy to obey and be governed by the order of said Court of Industrial Relations, then and in that event said court is hereby authorized to bring proper proceedings in the supreme court of the state of Kansas to compel compliance with said order; and in case either party to said controversy should feel aggrieved at any order made and entered by said Court of Industrial Relations, such party is hereby authorized and empowered within ten days after service of such order upon it to bring proper proceedings in the supreme court of the state of Kansas to compel said Court of Industrial Relations to make and enter a just, reasonable and lawful order in the premises. In case of such proceedings in the supreme court by either party, the evidence produced before said Court of Industrial Relations may be considered by said supreme court, but said supreme court, if it deem further evidence necessary to enable it to render a just and proper judgment, may admit such additional evidence in open court or order it taken and transcribed by a master or commissioner. In case any controversy shall be taken by either party to the supreme court of the state of Kansas under the provisions of this act, said proceedings shall take precedence over other civil cases before said court, and a hearing and determination of the same shall be by said court expedited as fully as may be possible consistent with a careful and thorough trial and consideration of said matter.

SEC. 13. No action or proceeding in law or equity shall ·be brought by any person, firm or corporation to vacate, set aside or suspend any

order made and served as provided in this act, unless such action or proceeding shall be commenced within thirty days from the time of the service of such order.

SEC. 14. Any union or association of workers engaged in the operation of such industries, employments, public utilities or common carriers, which shall incorporate under the laws of this state shall be by said Court of Industrial Relations considered and recognized in all its proceedings as a legal entity and may appear before said Court of Industrial Relations through and by its proper officers, attorneys or other representatives. The right of such corporations, and of such unincorporated unions or associations of workers, to bargain collectively for their members is hereby recognized: *Provided,* That the individual members of such unincorporated unions or associations, who shall desire to avail themselves of such right of collective bargaining, shall appoint in writing some officer or officers of such union or association, or some other person or persons as their agents or trustees with authority to enter into such collective bargains and to represent each and every of said individuals in all matters relating thereto. Such written appointment of agents or trustees shall be made a permanent record of such union or association. All such collective bargains, contracts, or agreements shall be subject to the provisions of section nine of this act.

SEC. 15. It shall be unlawful for any person, firm or corporation to discharge any employee or to discriminate in any way against any employee because of the fact that any such employee may testify as a witness before the Court of Industrial Relations, or shall sign any complaint or shall be in any way instrumental in bringing to the attention of the Court of Industrial Relations any matter of controversy between employers and employees as provided herein. It shall also be unlawful for any two or more persons, by conspiring or confederating together, to injure in any manner any other person or persons, or any corporation, in his, their, or its business, labor, enterprise, or peace and security, by boycott, by discrimination, by picketing, by advertising, by propaganda, or other means, because of any action taken by any such person or persons, or any corporation, under any order of said court, or because of any action or proceeding instituted in said court, or because any such person or persons, or corporation, shall have invoked the jurisdiction of said court in any matter provided for herein.

SEC. 16. It shall be unlawful for any person, firm, or corporation engaged in the operation of any such industry, employment, utility, or common carrier willfully to limit or cease operations for the purpose of limiting production or transportation or to affect prices, for the purpose of avoiding any of the provisions of this act; but any person, firm or corporation so engaged may apply to said Court of Industrial Relations for authority to limit or cease operations, stating the reasons therefor, and said Court of Industrial Relations shall hear said application promptly, and if said application shall be found to be in good faith and meritorious, authority to limit or cease operations shall be granted by

order of said court.    In all such industries, employments, utilities or common carriers in which operation may be ordinarily affected by changes in season, market conditions, or other reasons or causes inherent in the nature of the business, said Court of Industrial Relations may, upon application and after notice to all interested parties, and investigation, as herein provided, make orders fixing rules, regulations and practices to govern the operation of such industries, employments, utilities or common carriers for the purpose of securing the best service to the public consistent with the rights of employers and employees engaged in the operation of such industries, employments, utilities or common carriers.

SEC. 17.  It shall be unlawful for any person, firm or corporation, or for any association of persons, to do or perform any act forbidden, or to fail or refuse to perform any act or duty enjoined by the provisions of this act, or to conspire or confederate with others to do or perform any act forbidden, or to fail or refuse to perform any act or duty enjoined by the provisions of this act, or to induce or intimidate any person, firm or corporation engaged in any of said industries, employments, utilities or common carriers to do any act forbidden, or to fail or refuse to perform any act or duty enjoined by the provisions of this act, for the purpose or with the intent to hinder, delay, limit, or suspend the operation of any of the industries, employments, utilities or common carriers herein specified or indicated, or to delay, limit, or suspend the production or transportation of the products of such industries, or employments, or the service of such utilities or common carriers: *Provided,* That nothing in this act shall be construed as restricting the right of any individual employee engaged in the operation of any such industry, employment, public utility, or common carrier to quit his employment at any time, but it shall be unlawful for any such individual employee or other person to conspire with other persons to quit their employment or to induce other persons to quit their employment for the purpose of hindering, delaying, interfering with, or suspending the operation of any of the industries, employments, public utilities, or common carriers governed by the provisions of this act, or for any person to engage in what is known. as "picketing" or to intimidate by threats, abuse, or in any other manner, any person or persons with intent to induce such person or persons to quit such employment, or for the purpose of deterring or preventing any other person or persons from accepting employment or from remaining in the employ of any of the industries, employments, public utilities, or common carriers governed by the provisions of this act.

SEC. 18.  Any person willfully violating the provisions of this act, or any valid order of said Court of Industrial Relations, shall be deemed guilty of a misdemeanor, and upon conviction thereof in any court of competent jurisdiction of this state shall be punished by a fine of not to exceed $1,000, or by imprisonment in the county jail for a period of not to exceed one year, or by both such fine and imprisonment.

.SEC. 19.  Any officer of any corporation engaged in any of the industries, employments, utilities or common carriers herein named and specified, or any officer of any labor union or association of persons en-

gaged as workers in any such industry, employment, utility or common carrier, or any employer of labor, coming within the provisions of this act, who shall willfully use the power, authority or influence incident to his official position, or to his position as an employer of others, and by such means shall intentionally influence, impel, or compel any other person to violate any of the provisions of this act, or any valid order of said Court of Industrial Relations, shall be deemed guilty of a felony and upon conviction thereof in any court of competent jurisdiction shall be punished by a fine not to exceed $5,000 or by imprisonment in the state penitentiary at hard labor for a term not to exceed two years, or by both such fine and imprisonment.

SEC. 20. In case of the suspension, limitation or cessation of the operation of 'any of the industries, employments, public utilities or common carriers affected by this act, contrary to the provisions hereof, or to the orders of said court made hereunder, if it shall appear to said court that such suspension, limitation, or cessation shall seriously affect the public welfare by endangering the public peace, or threatening the public health, then said court is hereby authorized, empowered and directed to take proper proceedings in any court of competent jurisdiction of this state to take over, control, direct and operate said industry, employment, public utility or common carrier during such emergency: *Provided,* That a fair return and compensation shall be paid to the owners of such industry, employment, public utility or common carrier, and also a fair wage to the workers engaged therein, during the time of such operation under the provisions of this section.

SEC. 21. When any controversy shall arise between employer and employee as to wages, hours of employment, or working or living conditions, in any industry not hereinbefore specified, the parties to such controversy may, by mutual agreement, and with the consent of the court, refer the same to the Court of Industrial Relations for its findings and orders. Such agreement of reference shall be in writing, signed by the parties thereto; whereupon said court shall proceed to investigate, hear, and determine said controversy as in other cases, and in such case the findings and orders of the Court of Industrial Relations as to said controversy shall have the same force and effect as though made in any essential industry as herein provided.

SEC. 22. Whenever deemed necessary by the Court of Industrial Relations, the court may appoint such person, or persons, having a technical knowledge of bookkeeping, engineering, or other technical subjects involved in any inquiry in which the court is engaged, as a commissioner for the purpose of taking evidence with relation to such subject. Such commissioner when appointed shall take an oath to well and faithfully perform the duties imposed upon him, and shall thereafter have the same power to administer oaths, compel the production of evidence, and the attendance of witnesses as the said court would have if sitting in the same matter. Said commissioner shall receive such compensation as may be provided by law or by the order of said court, to be approved by the governor.

SEC. 23. Any order made by said Court of Industrial Relations as to a minimum wage or a standard of wages shall be deemed *prima facie* reasonable and just, and if said minimum wage or standard of wages shall be in excess of the wages theretofore paid in the industry, employment, utility or common carrier, then and in that event the workers affected thereby shall be entitled to receive said minimum wage or standard of wages from the date of the service of summons or publication of notice instituting said investigation, and shall have the right individually, or in case of incorporated unions or associations, or unincorporated unions or associations entitled thereto, collectively, to recover in any court of competent jurisdiction the difference between the wages actually paid and said minimum wage or standard of wages so found and determined by said court in such order. It shall be the duty of all employers affected by the provisions of this act, during the pendency of any investigation brought under this act, or any litigation resulting therefrom, to keep an accurate account of all wages paid to all workers interested in said investigation or proceeding: *Provided,* That in case said order shall fix a wage or standard of wages which is lower than the wages theretofore paid in the industry, employment, utility or common carrier affected, then and in that event the employers shall have the same right to recover in the same manner as provided in this section with reference to the workers.

SEC. 24. With the consent of the governor, the judges of said Court of Industrial Relations are hereby authorized and empowered to make, or cause to be made, within this state or elsewhere, such investigations and inquiries as to industrial conditions and relations as may be profitable or necessary for the purpose of familiarizing themselves with industrial problems such as may arise under the provisions of this act. All the expenses incurred in the performance of their official duties by the individual members of said court and by the employees and officers of said court, shall be paid by the state out of funds appropriated therefor by the legislature, but all warrants covering such expenses shall be approved by the governor of said state.

SEC. 25. The rights and remedies given and provided by this act shall be construed to be cumulative of all other laws in force in said state relating to the same matters, and this act shall not be interpreted as a repeal of any other act now existing in said state with reference to the same matters referred to in this act, except where the same may be inconsistent with the provisions of this act.

SEC. 26. The provisions of this act and all grants of power, authority and jurisdiction herein made to said Court of Industrial Relations shall be liberally construed and all incidental powers necessary to carry into effect the provisions of this act are hereby expressly granted to and conferred upon said Court of Industrial Relations.

SEC. 27. Annually and on or before January first of each year, said Court of Industrial Relations shall formulate and make a report of all its acts and proceedings, including a financial statement of expenses, and shall submit the same to the governor of this state for his information

The State, *ex rel.*, v. Cogley.

All expenses incident to the conduct of the business of said Court of Industrial Relations shall be paid by the said court on warrants signed by its presiding judge and clerk, and countersigned by the governor and shall be paid out of funds appropriated therefor by the legislature. The said Court of Industrial Relations shall, on or before the convening of the legislature, make a detailed estimate of the probable expenses of conducting its business and proceedings for the ensuing two years, and attach thereto a copy of the reports furnished the governor, all of which shall be submitted to the governor of this state and by him submitted to the legislature.

SEC. 28. If any section or provision of this act shall be found invalid by any court, it shall be conclusively presumed that this act would have been passed by the legislature without such invalid section or provision, and the act as a whole shall not be declared invalid by reason of the fact that one or more sections or provisions may be found to be invalid by any court.

SEC. 29. All acts and parts of acts in conflict herewith are hereby repealed.

SEC. 30. This act shall take effect and be in force from and after its publication in the official state paper.