## UNITED STATES v. BROTHERHOOD OF LOCOMOTIVE ENGINEERS et al.
### Civil Action No. 1936—48.

District Court of the United States for the District of Columbia.
July 2, 1948.
Writ of Certiorari Denied Nov. 15, 1948.
See 69 S.Ct. 137.

486

H. G. Morison, Asst. Atty. Gen., Joseph M. Friedman, Sp. Asst. to Atty. Gen., and Roscoe L. Barrow and Samuel K. Abrams, Attys., Department of Justice, both of Washington, D. C., for plaintiff.

Carl McFarland, Ashley Sellers, and Kenneth L. Kimble, all of Washington, D. C., for defendants.

GOLDSBOROUGH, Justice.   (Orally)

At our last hearing the Court ruled that in the matter of venue this case was controlled by Title 29, Section 185, subsection (c) U.S.C.A., which reads as follows:

"For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization.  (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members."

The Court thinks that as to the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen and Enginemen, there can be no controversy that they are liable to suit in the District of Columbia.   The Court also thinks that the Switchmen's Union of North America is liable to suit in the District of Columbia. Its President is a member of the organization, known as the Railway Labor Executives Association, which is representing its employees and the employees of these unions in the District of Columbia.   Section 10 of the bylaws of the Railway Labor Executives Association reads as follows:

"No member shall be obligated or bound by any action of the Association inconsistent with the laws or policies of the organization he represents, but no action, legal or otherwise, involving the Railway Labor Act, [45 U.S.C.A. § 151 et seq.], shall be taken by any organization or group of organizations that may substantially affect the interests of the other organizations, until such contemplated action has first been considered by the Association."

The amendments to the bylaws also state:

"That headquarters will be established for office of the Executive Secretary-Treasurer at Washington, D. C., provisions to be made for the necessary office equipment and personnel, same to be first approved by this Association; that the Executive Secretary-Treasurer will be required to make his home

in Washington, D. C., and shall assume the duties of his office on June 1, 1938."

The undisputed testimony is that this organization has been in the habit of meeting about every two months in the District of Columbia. Recently it has been meeting about once a month in the District of Columbia. It is also testified that the organization is registered under the Federal Regulation of Lobbying Act, 2 U.S.C.A. § 261 et seq., and in that connection represents the Switchmen's Union of North America along with other organizations.

■ The Court also calls attention that in this case service was made upon the Chief Executive Officer of each one of these organizations, and therefore there can be no question that the organizations had due notice of the fact that they had been sued.

Now, that disposes of the question of venue. The Court thinks that the question as to whether or not this case is controlled by the United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, is more a matter of law than a matter of the understanding of different individuals as to what was said at a conversation between the heads of these Brotherhoods and the Secretary of the Army. The authority of the Secretary of the Army is governed by the law and not by anything in any more or less desultory conversation which took place between him and the heads of the Brotherhoods at the time of the meeting.

■ The Secretary of the Army took the position that he didn't think he should interfere as long as the President was conducting the negotiations with Dr. Steelman's assistance, and that that is all he meant by anything he may have said at this meeting, but the Court wants to emphasize the fact that the Court thinks that his power to act is controlled by the law, and in view of the fact that the government had taken over the railways he had the authority to act on behalf of the government and take such action as seemed to be wise and proper under the circumstances.

■ The Court doesn't think at all that the fact that the government didn't see fit to change and alter the railway setup throughout the country, but decided to allow the railroads to be conducted in the usual manner unless and until it was finally determined that the negotiations would not be successful, in any way indicates that the United States didn't have actual control of the railroads and was not the employer of the employees of the seized carriers.

■ The Court sees no difference whatever in principle between this case and the case just referred to—the United Mine Workers case decided in 1947. Therefore, the Court has no doubt that this injunction should be made permanent.

■■ The Court also thinks, very definitely, that there is a much broader aspect to this whole situation. Assuming that the United States had not taken over the railroads, but had simply brought this action against the Brotherhoods, the Court thinks that the injunction should still have been made permanent, and the reason is this: While the Court takes the view that the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., in order to carry out its obvious purpose, which is to give labor a comparable bargaining power with capital, should not only be liberally construed, but most liberally construed, the Court is also very definitely of the opinion that it should not and cannot be literally construed. To take what the Court thinks is an analogous situation. Suppose, in a hotel, there is a strict rule—there can be no deviations from it at all—there is a strict rule that the employees shall go out a side entrance and the the guests shall go out the front entrance. Now, that is a strict rule. There are no exceptions to that rule, but a fire takes place, and a fire prevents the employees from going out the side entrance. Would anybody say that they were violating the rules of the hotel if they used the front entrance? There is an implication there, a necessary implication, and a limitation under the rules, and so it is in this case, the Court thinks. Of course, the rights of the unions, under the labor laws passed in the last quarter of a century, are well recognized. They can organize, they can argue for their rights, they can't be discharged because they are trying to create a situation which they think will improve their condition.

They can strike under the Norris-La-Guardia Act, even when it would cause

great inconvenience and great loss of production and distribution, but they can't go to the point, in order to have their way, however much right they have on their side, they can't go to the point of adopting a process which would disintegrate society itself, and that is the situation here.

Let's see what this notice is that was sent out to employees—this strike notice, on April 29, 1948:

"So far as your legal right to strike is concerned there is no difference between a mail train and any other train. You have identically the same right to refuse to perform service on a mail train as you have to refuse to perform service on any other train. Men in road and yard service are to handle and transport troop trains, hospital trains and milk trains, with the understanding that no other service is to be performed in connection therewith."

■ In face of the fact that the unions have had the benefit of the Railway Labor Board, an impartial body, the Mediation Service, an impartial body, the Board of Inquiry appointed by the President, an impartial body, they sent out that notice, which meant that the rail transportation system of the country, at six o'clock on a certain morning, would simply stop.

The undisputed evidence that 90 per cent of the mail could not be handled and the undisputed evidence that 70 to 72 per cent of the freight and passenger traffic could not be handled, simply means that in a few weeks hunger would stalk the country, the whole economic and political system would be upset, political ideologies which are opposed to the democratic ideology would have an opportunity to engraft themselves here in this country, our influence throughout the world would be done away with and we would become a laughing stock. It is an extreme case, and it constitutes, in this Court's opinion, a limitation upon the power of a labor union to carry out its purposes, however legitimate they may be, by the strike process.

The Court is thoroughly familiar with the Norris-LaGuardia Act. As I have said before, I don't think Congressman La-Guardia ever advocated anything when he was in the House of Representatives where I didn't support him, and I don't think I ever advocated anything in the House of Representatives where he didn't support me.

The purpose of the Act, as I said before, was to give labor a comparable bargaining power with capital, but to permit a strike of this kind to take place is an extreme situation which society is not required to tolerate under the Norris-LaGuardia Act, and the injunctive process is a proper one to pursue. See In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092. The Court wants to emphasize that the Court is of the opinion that the United Mine Workers case, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, is controlling. The Court also wants to emphasize the Court's deliberate opinion that the Norris-LaGuardia Act does not control a situation where the entire transportation system of the country would be stopped. The Court will grant the permanent injunction, gentlemen.

Findings of Fact and Conclusions of Law.

Upon consideration of plaintiff's application for a final injunction, the evidence adduced on July 1, 1948, at the hearing on the application, the pleadings, briefs, arguments of counsel, and the entire record in this cause, the Court hereby makes the following findings of fact and conclusions of law.

Findings of Fact.

1. On January 16, 1948, the defendants herein issued a strike call to become effective as to the carriers designated therein at 6:00 a. m. on February 1, 1948.

2. On January 23, 1948, the National Mediation Board advised the President of the United States that in its judgment there existed a situation such as is described in Section 10 of the Railway Labor Act, as amended, 45 U.S.C.A. § 160, in respect of a wage dispute between designated carriers by railway and certain of their employees represented by defendants herein, that the said dispute threatens to interrupt interstate commerce to a degree which would deprive the country of essential transportation service, and that a strike date had been set by the labor organizations for 6:00 a. m., February 1, 1948.

3. On January 27, 1948, the President, pursuant to Section 10 of the Railway Labor Act, issued Executive Order No. 9929 creating an Emergency Board to investigate the above-mentioned dispute, and on January 30, 1948, appointed Wm. M. Leiserson, Chairman, and George E. Bushnell and W. Willard Wirtz, Members of the Board.

4. On March 27, 1948, the Board transmitted its report on its investigation of the issues in the dispute, together with its recommendations as to the issues, to the President and on the same date the report was made public.

5. On March 29, 1948, the carriers involved in the dispute advised the President that they were willing to make effective the recommendations made by the Board in its report.

6. On April 6, 1948, the defendants advised the carriers that they had declined to accept the recommendations of the Emergency Board but at the same time requested a conference with the carriers to be held on April 14, 1948, for the purpose of discussing the matters considered in the Board's report.

7. From April 14th to April 27, 1948, joint sessions by the carriers and the defendants were held, but no agreement was reached.

8. Section 10 of the Railway Labor Act provides that, "After the creation of such board, and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." Since the Board's report was made on March 27, 1948, the "cooling-off" period provided in Section 10 expired as of April 27, 1948. On April 28, 1948, the National Mediation Board, pursuant to Section 5 of the Railway Labor Act, 45 U.S.C.A. § 155, advised the parties to the dispute that it desired to discuss the situation further with a view to arriving at a settlement of the issues.

9. Mediation Board proceedings commenced in Chicago, Illinois, on April 29, 1948 and were terminated on May 4, 1948, but no agreement by the parties was reached. On April 30, 1948, during the above mediation proceedings, the Labor organizations involved notified the carriers in writing that all employees represented by them would withdraw from the service of the carriers at 6:00 a.m., May 11, 1948, unless the issues in the dispute were settled prior thereto.

10. On May 10, 1948, the President of the United States acting under the Constitution and Laws of the United States, including the Act of August 29, 1916, 39 Stat. 619, 645, issued Executive Order No. 9957. By the terms of said Executive Order the United States took possession of and assumed control and operation of those carriers by railroad named in the Executive Order, and the Secretary of the Army was given authority to take possession and assume operation and control, in the name of the United States, of such additional carriers as he should deem necessary in order to carry out the purposes of the Executive Order. Upon the assumption on May 10, 1948, of such possession, control and operation of the carriers by the United States, the United States became the employer of the employees performing services on the seized carriers. Such employee relationship has continued to the date of this hearing and at no time since May 10, 1948, have the carriers themselves stood in the capacity of employers.

11. On May 10, 1948, subsequent to the effective hour on that date of Executive Order No. 9957, the Secretary of the Army conferred with the chief executives of the defendants herein relative to the continuation of services on the seized carriers. During such conference the Secretary of the Army asked the chief executives of the defendants whether those railway employees having membership in the labor organizations represented by them would continue to perform services on the railroads which had been taken by the United States and whether the strike call set for 6:00 a. m., May 11, 1948, would be called off and cancelled. The chief executive of each of the defendants advised that the strike call would not be called off or cancelled and that the railway employees having membership in the Unions represented by them would not be advised to continue

to perform services on the seized carriers after 6:00 a.m., May 11, 1948.

12. (a) Since the issuance of Executive Order No. 9957 on May 10, 1948, the Secretary of the Army has been in possession of and has exercised full and complete authority in the operations of the transportation systems owned or operated by the carriers by railroad of which possession, control and operation has been taken under the terms of the said Executive Order.

(b) The authority possessed and exercised by the Secretary of the Army has included management of the affected transportation systems by railroad and the power to fix the wages, hours, terms and conditions of employment of the employees performing services on such systems.

(c) The former management of carriers whose transportation systems have been taken over by the United States of America have since May 10, 1948, continued to perform certain managerial functions with respect to the operations of the affected transportation systems but all such functions so performed have been by virtue of an express delegation of authority, by the Secretary of the Army to such former management. The Secretary of the Army has had during such period the power to withdraw such delegation either in whole or in part, and further has had the authority to exercise such managerial functions himself or to delegate them to subordinates of his own choosing.

(d) Since May 10, 1948, negotiations concerning wages, hours, terms and conditions of employment have been carried on between defendant Unions and the former management of the affected transportation systems, with the assistance of John R. Steelman, Assistant to the President. The Secretary of the Army has been cognizant of the existence and of the progress of such negotiations. The Secretary of the Army has permitted and encouraged the continuation of such negotiations in, the belief that, if the former management and defendant Unions reach an agreement concerning wages, hours, terms and conditions of employment, the United States of America will be enabled to return the seized transportation systems to former management with the assurance that there will be no interruption in the transportation service necessary to the national health, safety and welfare. The Secretary of the Army has been aware throughout the period since the issuance of the Executive Order aforesaid of his authority and power under the said order to fix wages, hours, terms and conditions of employment of the employees performing services on the affected transportation systems.

13. Among the actions which the Secretary of the Army has taken, incident to the assumption by the United States of possession, operation and control of the railroads, are the following:

(a) The lifting of embargoes on the movement of perishables and livestock, which embargoes had been issued by 105 railroads prior to the issuance of Executive Order No. 9957 and in anticipation of the threatened strike:

(b) The establishment of a regional administrative system, seven regions having been established, for the supervision of railroad operations, and under which rules and regulations of the Secretary of the Army or duly authorized subordinates, in addition to those contained in the Executive Order, may be made to affect carriers;

(c) The assignment of a representative of the Secretary of the Army to each carrier of which the Government has taken possession and assumed operation and control.

(d) Under the authority vested in the Secretary of the Army by the Executive Order to assume, in the name of the United States, such additional railroads as may be necessary, the Secretary has assumed possession, control and operation of the following railroads not named in the Executive Order: the Central Railroad Company of Pennsylvania, the Hudson and Manhattan Railroad Company, and the Central Railroad Company of New Jersey:

(e) The Department of the Army has issued instructions implementing the Executive Order, has issued directives and instructions establishing procedures governing its regional directors of railroads and its representatives with each individual railroad. Said procedures require the giving of notice to the carriers and em-

ployees of the assumption of responsibility for possession and control of the carriers affected, daily reports by the individual representatives to the regional representatives and by the regional representatives to the Railway Transport Service Division, Transportation Corps.

14. There is now threatened by the defendants herein, and each of them, a strike in the railway industry of the nation. Such strike, if permitted to occur, will affect a substantial part of an industry engaged in interstate commerce. Despite the fact that the United States of America assumed possession, control and operation of the affected carriers by Executive Order No. 9957, the strike call was not withdrawn by defendants and continued outstanding until the service of the temporary restraining order in this cause. There continues the threat of a strike in the railway system of the Nation.

15. (a) In the event that a strike of the carriers named in the Executive Order is permitted to occur, there will necessarily result a work stoppage in virtually the entire railway system of the nation. Although the defendant unions represent only a fractional part of the total railway employees of the nation, the nature of their work and of the operation of the interstate railway system is such that a strike on their part will necessarily result in the inability of the remaining railway employees of the United States to perform their jobs and virtually all railway operations will immediately cease.

(b) Such threatened strike, if permitted to occur, will deprive the country of essential transportation service and will greatly obstruct the flow of interstate commerce and the transmission of the mails of the United States over the affected railway system.

(c) Such threatened strike, if permitted to occur, will deprive the Department of the Army, and the Military Establishment generally of supplies and materials, and mobility of personnel, necessary to the operations of the Military at home and in the occupied countries abroad.

(d) Such threatened strike if permitted to occur, will prevent the United States from carrying out the nation's foreign assistance programs, through which the United States, under the Economic Cooperation Act and other programs is carrying on the rehabilitation and recovery of friendly foreign nations.

(e) Such threatened strike, if permitted to occur, will interfere with and obstruct the effective performance and discharge of vital and necessary Governmental functions and will frustrate the powers conferred by the Constitution and by Acts of Congress upon the Executive Branch of the Government.

(f) Such threatened strike if permitted to occur, will imperil the national health and safety.

(g) Such threatened strike, if permitted to occur will cause plaintiff, United States of America, irreparable injury for which it has no adequate remedy at law.

16. Defendant, Brotherhood of Locomotive Engineers, is an unincorporated labor organization and is an independent union representing employees in the railway industry. Duly authorized agents of the said defendant are engaged in representing and acting for employee members of said defendant in the District of Columbia. The defendant Brotherhood of Locomotive Engineers maintains, and has maintained at least since 1911, an office in the District of Columbia. Said defendant maintains and has maintained at least since 1933, a National Legislative Representative in the District of Columbia, which official represents said defendant before committees of the Congress, the Interstate Commerce Commission, and contacts members of the Congress relative to all matters of interest to the members of the Brotherhood of Locomotive Engineers. Said defendant has, and has had since about 1880, a local union organized and operating in the District of Columbia. The Chief executive of said defendant has been engaged in the District of Columbia in industrywide collective bargaining negotiations since about May 7, 1948, in behalf of all of its employee members.

17. Defendant, Brotherhood of Locomotive Firemen and Enginemen, is an unincorporated labor organization and is an independent union representing employees in the railway industry. Duly authorized

agents of the said defendant are engaged in representing and acting for employee members of said defendant in the District of Columbia. The defendant Brotherhood of Locomotive Firemen and Enginemen maintains, and has maintained since approximately 1922, an office in the District of Columbia. This defendant maintains, and has maintained at least since 1940, a national Legislative Representative in the District of Columbia, which official represents this defendant at hearings before Congressional Committees and the Interstate Commerce Commission, contacts Members of Congress and officials of Government agencies relative to matters of interest to the Brotherhood of Firemen and Engineers, and handles such other matters as may be referred to him by the National headquarters or by locals of the Brotherhood. The official publication of the Brotherhood is printed in the District of Columbia. This defendant has two local unions organized and operating in the District of Columbia. The chief executive of this defendant has been engaged in the District of Columbia in industry-wide collective bargaining negotiations since about May 7, 1948, in behalf of all of its employee members. The Railway Labor Executives Association, which is registered under the Federal Lobbying Act and which has its headquarters in the District of Columbia, is engaged in representing this defendant in the District of Columbia in matters, before Congressional Committees, the Congress, the Interstate Commerce Commission, and in which the members of this defendant are interested.

18. Defendant, Switchmen's Union of North America, is an unincorporated labor organization affiliated with the American Federation of Labor and represents employees in the railway industry. Duly authorized agents of the said defendant are engaged in representing and acting for employee members of said defendant, in the District of Columbia. The chief executive of the defendant Switchmen's Union of North America has been engaging in the District of Columbia in industry-wide, collective bargaining negotiations since about May 7, 1948, in behalf of all of its employee members. The Railway Labor Executives Association, which is registered under the Federal Lobbying Act and which has its headquarters in the District of Columbia, is engaged in representing this defendant in the District of Columbia in matters, before Congressional Committees, the Congress, the Interstate Commerce Commission, and in which the members of this defendant are interested. This defendant is affiliated with the American Federation of Labor which has its National headquarters in the District of Columbia.

19. On May 10, 1948, plaintiff filed its verified complaint and supporting affidavits and prayed that a permanent injunction against the threatened strike be issued and that temporary injunctive relief be granted.

20. It appearing to the court that temporary injunctive relief should be granted, a temporary restraining order was issued on May 10, 1948. By its terms the order was to expire at 7:45 p. m. May 19, 1948, unless extended. By the same order, a hearing on the plaintiff's motion for preliminary injunction was set down for 10:00 a. m., May 19, 1948.

21. Copies of the summons, complaint and temporary restraining order were served in the District of Columbia on the following: Alvanley Johnston, Grand Chief Engineer, Brotherhood of Locomotive Engineers, John T. Corbett, Assistant Grand Chief and National Legislative Representative, Brotherhood of Locomotive Engineers, D. B. Robertson, President of the Brotherhood of Locomotive Firemen and Enginemen, Jonas H. McBride, Vice President and National Legislative Representative, Brotherhood of Locomotive Firemen and Enginemen, and Arthur J. Glover, President, Switchmen's Union of North America. Also, service was had on the headquarters of the Switchmen's Union of North America, in Buffalo, New York.

22. On May 18, 1948, for good cause shown, the temporary restraining order was extended from 7:45 p. m. May 19, 1948, to 7:45 p. m. May 29, 1948, and hearing on plaintiff's motion for preliminary injunction was postponed to 10:00 a. m. May 28, 1948.

23. On May 28, 1948, upon written consent of all the defendants, the temporary

restraining order was extended from 7:45 p. m. May 29, 1948, to 7:45 p. m., June 11, 1948, and hearing on the preliminary injunction was postponed to 10:00 a. m., June 10, 1948.

24. On May 27, 1948, defendants filed motions to dismiss the complaint, and filed supporting affidavits and a statement of points and authorities. On June 5, 1948, plaintiff submitted its response and opposition to motions to dismiss, its supporting affidavits and its statement of points and authorities.

25. On June 9, 1948, defendants filed their further statement of points and authorities in support of their motions to dismiss and a further affidavit by Arthur J. Glover, President of defendant Switchmen's Union of North America.

26. On June 10, 1948, this matter came on to be heard on plaintiff's motion for a preliminary injunction and on defendants' motions, and the Court having heard argument of counsel, and having considered the briefs, which had been previously filed, and all the pleadings, and being fully advised in the premises, the motions to dismiss were denied, and the preliminary injunction was granted.

27. On July 1, 1948, a hearing on plaintiff's application for a final injunction was held, at which plaintiff and defendants were heard and presented testimony.

## Conclusions of Law.

1. The United States District Court for the District of Columbia has jurisdiction of the subject matter and of the parties in this cause.

2. This suit was properly brought in the District Court for the District of Columbia as to the defendants, and each of them; venue was properly cast in this district as to all of the defendants.

3. Service of process in this case was proper as to the defendants and each of them.

4. The taking of possession and assumption of control, and operation of the railroads by the United States was valid.

5. An employee-employer relationship between the employees performing services on the seized carriers and the United States exists and has existed at all times since the carriers were seized on May 10, 1948.

6. No statutory enactment prohibits the issuance of an injunction under the facts of this case, including but not limited to the Norris-LaGuardia Act, the Railway Labor Act and the Labor Management Relations Act, 1947.

7. The United States of America since the issuance of the Executive Order on May 10, 1948, has been in possession of and has exercised full and complete authority in the operation of the transportation systems owned or operated by the carriers by railroad of which possession, control and operation has been taken under the terms of the Executive Order.

8. (a) In the event that the threatened strike is permitted to occur, there will necessarily result a work stoppage in virtually the entire railway system of the nation.

(b) Such threatened strike, if permitted to occur, will deprive the country of essential transportation service and will greatly obstruct the flow of interstate commerce and the transmission of the mails of the United States over the affected railway system.

(c) Such threatened strike, if permitted to occur, will deprive the Department of the Army, and the Military Establishment generally of supplies and materials, and mobility of personnel, necessary to the operations of the Military at home and in the occupied countries abroad.

(d) Such threatened strike, if permitted to occur, will prevent the United States from carrying out the various foreign assistance programs through which the United States, under the Economic Cooperation Act and other programs, is carrying on the rehibilitation and recovery of friendly foreign nations.

(e) Such threatened strike on the part of the defendants, as aforesaid, if permitted to occur, will interfere with and obstruct the effective performance and discharge of vital and necessary Governmental functions and will frustrate the powers conferred by the Constitution and by Acts of Congress upon the Executive branch of the Government.

494

(f) Such threatened strike as aforesaid if permitted to occur, will imperil the national health and safety.

9. Unless the threatened strike is enjoined, the United States of America, plaintiff herein, will suffer irreparable injury for which it has no adequate remedy at law.

### Permanent Injunction.

This matter having come on for hearing on July 1, 1948, on plaintiff's application for a permanent injunction, and the Court having considered the evidence adduced at the hearing, the pleadings and supporting affidavits, the briefs, arguments of counsel, and the entire record herein, and the Court having made findings of fact and conclusions of law, as above set forth, now, therefore, it is by the Court this 2nd day of July, 1948, ordered that the defendants, and each of them, and their officers, agents, servants and employees, and all persons in active concert or participation with them, be and they are hereby enjoined from in any manner encouraging, ordering, engaging in, or taking any part in a strike in the transportation by railroad system of the United States, or from in any manner interfering with or affecting the orderly continuance of work in the said railway system, and from taking any action which would interfere with this Court's jurisdiction in the premises.