## UNITED STATES v. SWITCHMEN'S UNION OF NORTH AMERICA.

Civ. No. 4638.

United States District Court
W. D. New York.

Aug. 11, 1950.

George L. Grobe, U. S. Atty., Buffalo, N. Y., Joseph M. Friedman, Sp. Asst. to Atty. Gen., and Jess H. Rosenberg, Attorney, Department of Justice, Washington, D. C. (Henry W. Killeen, Jr., Asst. U. S. Atty., Buffalo, N. Y., of counsel), for plaintiff.

Andrew B. Gilfillan, Jr., Buffalo, N. Y., Harold C. Heiss, and Charles W. Phillips, Cleveland, Ohio, for defendant.

KNIGHT, Chief Judge.

This is an action for an injunction restraining the Switchmen's Union of North America, and its members, from participating in and continuance of a strike against the Chicago, Rock Island & Pacific Railroad Company (hereinafter called the Rock Island). Originally a strike was called against five railroads, including the Rock Island.

Late last year conferences were held between the representatives of the union and of the railroad in an attempt to settle a dispute over hours of labor and wages. The National Mediation Board was called in and further conferences were held without results. The strike was withdrawn as to all of the five railroads except the Rock Island. On March 21st, 1950, the union announced withdrawal of all of its men from service on the last mentioned railroad. On March 20th, 1950, the President of the United States issued an executive order creating an Emergency Board to investigate and report the facts involved in the strike. The union had refused to submit to a hearing as to all five railroads. No further investigation by the Emergency Board was had but a report was made by that Board disallowing a forty

hour work week with pay for forty-eight hours.

On July 8, 1950, the United States Government seized the Rock Island and the union refused to put its men back to work. A temporary restraining order was issued out of this court. Thereupon the men went back to work and the railroad has been continued to be run until this time under Government control. A hearing on this motion was had before this court on August 3rd, 1950. The expiration date of the temporary restraining order was August 4, 1950, but by stipulation of the parties that date is now advanced to August 14, 1950.

It is the contention of the defendant, (1) that jurisdiction of this court is denied by the Norris-La Guardia Act, 29 U.S.C.A. § 104; (2) that the Executive Order issued by the President directing the seizure of the railroad is not a valid exercise of the power granted to the President by the Act of August 29, 1916, 39 Stat. 619, 10 U.S.C.A. § 1361: and (3) that the Act of August 29, 1916, does not create an employer-employee relationship between the Government and defendant's members to justify relief under the circumstances of this case.

At the hearing before this court, on August 3rd, 1950, witnesses were sworn and examined and numerous documents were received in evidence.

The Rock Island is fifteenth in rank of the sixty-four Class 1 steam railways in the United States. In respect to mileage it ranks tenth. It owns 7,619 miles of road, operates 469.49 miles over other roads; in addition operates 651.37 miles of second and other main tracks and owns a large mileage of side tracks. This mileage is situated in fourteen states and 268 counties, with a total population of 15,772,057 persons. It has 509 steam locomotives, 285 Diesel engines, 26,956 freight train cars, and 761 passenger cars. It also has many units of service equipment. It has been operating 62 through trains in service, 110 suburban passenger trains daily and 338 freight trains daily, serving 785 stations on its line not served by any other railroad. In 1949 the total miles operated in the United States on main lines was 226,546, of which Rock Island operated 7619.11 miles.

This railroad serves the mid-west territory from Lake Michigan to the Rocky Mountains and from St. Paul and Minneapolis to Texas. Its tonnage carried consists generally of wheat, corn, oats and other grains, vegetables, cattle, meat, lumber and manufactured goods from the many large cities on its lines. Its annual report for 1949 states that the total tons of revenue freight was 38,507,960. The average tonnage for the last seven years has been approximately 41,300,000 tons and the passengers carried in 1949 numbered 11,930,925. The railroad employs 20,000 men and how many more are lost to employment or will be lost to employment by strike cannot be estimated.

In March alone of this year, its lines carried 50,000 lineal feet of mail; 833—60 foot sized cars or about 27 cars a day; 8—60 foot railroad post office cars daily, 52—30 foot department cars and 18—15 foot department cars.

Mr. Aitchison, a member of the Interstate Commerce Commission, and Mr. Miller, Deputy Assistant Postmaster General, have given testimony in great detail as to the above and many other activities or operations of the Rock Island.

In times of peace or in times of war, one can readily understand how a failure in the operation of this great railroad system affects the economy of the nation. In times of war continued operation is necessary to the military success of the country.

The complaint alleges these bases for an injunction: obstruction of interstate commerce in transmission of the mails; obstruction of the performance of vital and necessary governmental functions; the imperiling of the nation's security and irreparable injury for which the Government has no adequate remedy at law. The testimony is barren of any denial of these allegations in the complaint and, indeed, they are undeniable.

It is the claim of the Government in the circumstances of the present case that the issuance of an injunction is within the equity jurisdiction of this court. If there is no statute limiting the power under the circumstances shown here, this court is con-

cluded by the decision of the Supreme Court In re Debs, 158 U.S. 564, 15 S.Ct. 900, 912, 39 L.Ed. 1092. That suit was brought to compel the Pullman Palace Car Company to adjust certain differences with the American Railway Union. It is a well known case and the decision has never been overruled. In that case it was said: "Summing up our conclusion, we hold that the government of the United States is one having jurisdiction over every foot of soil within its territory, and acting directly upon each citizen; that, while it is a government of enumerated powers, it has within the limits of those powers all the attributes of sovereignty; that to it is committed power over interstate commerce and the transmission of the mail; that the powers thus conferred upon the national government are not dormant, but have been assumed and put into practical exercise by the legislation of Congress * * *; that the proceeding by injunction is of a civil character, and may be enforced by proceedings in contempt".

In that case it was charged that the defendants attempted to create a boycott and it prevented the operation of certain trains.

The opinion by Judge Brewer is almost classical in argument and citation of applicable authorities. See also State ex rel. Hopkins v. Howat, 109 Kan. 376, 389, 198 P. 686, 25 A.L.R. 1210.

In United States ex rel. Greathouse v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250, it was said that the "Allowance of mandamus is controlled by equitable principles". In Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 601, 81 L.Ed. 789, the court said that controversy affecting interstate commerce "is a matter of public concern" and "Courts of equity * * * go much farther * * * than * * * when only private interests are involved". Texas & N. O. R. Co. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034.

In the Debs case the court definitely held that the court has jurisdiction to issue an injunction in the aid of the performance of its governmental affairs.

It is believed that this court can take judicial notice of the United Nations' conflict over Korea. Vol. 31 Corpus Juris Secundum, Evidence, § 62, page 639. This greatly emphasizes the necessity for the continued operation of this railroad. However, neither the war with Germany nor Japan has ever been dissolved and no treaty of peace has followed these wars. The statutes effective only "in time of war" continue in force until a formal statement of peace is declared. Hamilton v. Kentucky Distilleries Co., 251 U.S. 146, 40 S.Ct. 106, 64 L.Ed. 194. In Commercial Cable Co. v. Burleson, D.C., 255 F. 99, 101, the joint resolution adopted July 16, 1918, authorizing the President during the continuation of war to take possession and control of telegraphs and marine cables was held constitutional and was an appropriate war measure. It also held it is not affected by the "armistice". In United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 546, 70 S.Ct. 309, 94 L.Ed. 317, a decision handed down January 16, 1950, it was held that a state of war still exists.

The Act of August 29, 1916, 39 Stat. 645, 10 U.S.C.A. § 1361, which empowers the President "to take possession and assume control" in an emergency as exists at present on the Rock Island was invoked during actual hostilities. In United States v. Brotherhood of Locomotive Engineers, D.C., 79 F.Supp. 485, the question of there being actual hostilities then was not involved, but the seizure was held valid by virtue of Executive Order No. 9957, 13 F.R. 3875.

The Act of August 29, 1916, provides: "The President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable."

In the instant case the seizure was made by virtue of Executive Order No. 10141,

issued under the provisions of the above statute of August 29, 1916. This Executive Order recites that, "Whereas I find that as a result of a labor disturbance there are interruptions, and threatened interruptions, of the operations of the transportation system owned or operated by the Chicago, Rock Island & Pacific Railroad Company; that it has become necessary to take possession and assume control of the said transportation system for purposes that are needful or desirable in connection with the present emergency; and that the exercise, as hereinafter specified, of the powers vested in me is necessary to insure in the national interest the operation of the said transportation system".

Martin v. Mott, 25 U.S. 19, 6 L.Ed. 537, held that the authority to decide whether the exigencies contemplated in the Constitution of the United States, and the act of Congress of 1795, Ch. 101 [1 Stat. 424, c. 36], in which the president has authority to call forth the militia, is exclusively vested in the president, and his decision is exclusive upon all other persons.

Dakota Central Telegraph Co., v. State of South Dakota, ex rel. Payne 250 U.S. 163, 39 S.Ct. 507, 63 L.Ed. 910, held "The Joint Resolution [of Congress] authorizing the President during the continuance of * * * war, whenever he shall deem it necessary * * * to take possession and assume control * * * of any telephone line * * * and operate it * * * is within the * * * power of Congress. * * * Whether the exercise of the power * * * [is] justified by the conditions * * * [is a] question of executive discretion [and] not within the cognizance of the judiciary".

■ The Norris-La Guardia Act, adopted March 23, 1932, Chapter 90, Sec. 4, 47 Statute 70, enumerates the specific acts not subject to restraining orders or injunctions.

The Norris-La Guardia Act, in part reads:

"No court of the United States shall have **jurisdiction to** issue any restraining **order** or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

" (a) Ceasing or refusing to perform any work or to remain in any relation of employment;

\*   \*   \*   \*   \*   \*

" (g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

" (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title."

It is claimed by the plaintiff that no wrongful act has been pleaded that entitles the defendant to injunctive relief. The defendant cites American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, and quotes part of the opinion to the effect that "the right to engage in a non-violent strike is lawful". Obviously that case presents no comparable state of facts. There the Clayton Act was construed, and it was held, that it did not apply to the dispute between an employer and persons who were neither ex-employees nor seeking employment. It is noted that the court said, "Each case must turn on its own circumstances. It is a case for the flexible remedial power of a court of equity which may try one mode of restraint, and if it fails or proves to be too drastic, may change it."

United States Railroad Administration v. Burch, D.C., 254 F. 140, 142, has no application here. That was a case in which the Government sought to take possession of property not necessary to the operation of the railroad. The Court said: "it is evident that the purpose of the statute giving such enlarged powers, to be exercised during the emergency of war, was not for the purpose of taking possession of any property which

might be owned by the different corporations operating and owning systems of transportation, * * * wholly independent of transportation uses * * *."

In Toledo, P. & W. Railroad v. Stover, D.C., 60 F.Supp. 587, held that Executive Order 9108 purporting to be issued in pursuance of the Act of August 29, 1916, supra, did not authorize the possession of the plaintiff's railroad by the Director of the Office of Defense rather than the Secretary of War. The Court did say the Act of 1916 showed "the intention of the Congress that in time of war, a transportation system taken over by executive order should be operated by the Secretary of War for prime purpose of the war effort * * *", but the Act also said that possession and control are to be had "for such other purposes connected with the emergency as may be needful or desirable". As recited in the Executive Order 10141 it is said, "that it has become necessary to take possession and assume control of the said transportation system for purposes that are needful or desirable in connection with the present emergency".

■ The defendant claims that relation of employer and employee does not exist or, in other words, that the government does not stand in the relationship of an employer. The decision of the Supreme Court in United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 694, 91 L.Ed. 884, directly held that the government and the workers occupied the relationship of employer and employee. It was there stated: "* * *. In a case such as this, where the Government has seized actual possession of the mines, or other facilities, and is operating them * * * the relationship between the Government and the workers is that of employer and employee".

The government has seized the Rock Island and is operating it. The opinion in United States v. Brotherhood of Locomotive Engineers, supra, likewise is directly in point here. The attempt of defendant to differentiate the Mine Workers case from the one at bar is fruitless and one cannot escape the clear meaning of "employer" and "employee" wherein in the Mine Workers case the government in possession was designated as the employer and the workmen as employee.

As pointed out in the government brief, since the Executive action cannot be judicially reviewed, the only recourse left to defendant is a claim that the seizure was merely nominal in character or was taken in or not made in good faith, or on both claims. None, however, are asserted and none to be determined by judicial determination.

■ That the Executive Order herein, or the basis of fact on which it rests, cannot be reviewed judicially, has been decided by numerous cases in the Supreme Court. In United States v. Chemical Foundation, Inc., 272 U.S. 1, 14 and 15, 47 S.Ct. 1, 6, 71 L.Ed. 131, the court said, "The validity of the reasons stated in the orders, or the basis of fact on which they rest will not be reviewed by the courts * * *."

I find that this Court has jurisdiction of the subject matter and of the parties in this suit.

■ I find that an employee-employer relationship subsists between the employees performing services on the seized railroad and the United States.

Next I find that a continuance or resumption of the strike will deprive the Nation of an essential transportation service and will substantially obstruct the flow of interstate commerce and the transmission of the mails of the United States over the affected railway system.

An order may be entered (a) enjoining the defendant Switchmen's Union of North America, its officers, agents, servants, and employees and all persons in active concert or participation with them, from continuing in whole or in part the strike now in existence in the system of transportation in the possession, control and operation of the United States of America under Executive Order No. 10141, or from in any manner interfering with or affecting the orderly continuance of work in the said transportation system, and from taking any action which would interfere with this Court's

jurisdiction in the premises, and (b) directing the defendant Switchmen's Union of North America, its officers, agents, servants and employees and all persons in active concert or participation with them to cease the said strike and to effectuate the resumption of the normal employment of the employees under Executive Order No. 10141.

An order may be entered (a) enjoining the members of Switchmen's Union of North America, acting in concert, from continuing in whole or in part the strike now in existence in the system of transportation in the possession, control and operation of the United States of America under Executive Order No. 10141, or from in any manner interfering with or affecting the orderly continuance of work in the said transportation system, and from taking any action which would interfere with this Court's jurisdiction in the premises, and (b) directing the members of Switchmen's Union of North America, acting in concert, to cease the said strike and to resume their normal employment under Executive Order No. 10141; Provided, however, that nothing in this paragraph shall be construed to require an individual employee to render labor or service without his consent nor to make the quitting of his labor or service by an individual employee an illegal act.

An order may be entered directing the said Switchmen's Union of North America, and its appropriate officers, agents, servants and employees, forthwith to instruct—and to take all action as may be necessary to insure that such instructions are carried out—all members of the said Union employed in the railway system covered by Executive Order No. 10141 to cease the said strike and to return to their employment forthwith; and that the Union, acting through the said officers, agents, servants and employees, cease, desist and refrain from ordering, encouraging, recommending, instructing, inducing or in any wise permitting the said strike to continue in whole or in part.

This order is preliminary only, pending the final determination of the cause.

Findings to accord herewith may be submitted.